PEOPLE v MATEO

Docket No. 96079. Argued October 12, 1995 (Calendar No. 9). Decided
    July 31, 1996.

Raul I. Mateo was convicted by a jury in the Oakland Circuit Court,
    Francis X. O'Brien, J., of assault with intent to murder and feloni-
    ous assault and thereafter pleaded guilty of being an habitual
    offender, second offense. The Court of Appeals, BRENNAN, P.J., and
    CAVANAGH and CORRIGAN, JJ., affirmed in an unpublished opinion per
    curiam, holding that although the trial court erred in admitting cer-
    tain rebuttal testimony over objection, because it involved
    impeaching a witness on a collateral matter, because the witness'
    inconsistent statement was created by eliciting a denial on cross-
    examination, and because the remaining evidence against the
    defendant was overwhelming, the error was harmless beyond a rea-
    sonable doubt (Docket No. 134528). The defendant appeals.

    In an opinion by Justice BOYLE, joined by Chief Justice BRICKLEY,
    and Justices RILEY, MALLETT, and WEAVER, the Supreme Court held:

    MCL 769.26; MSA 28.1096 does not impinge on the Supreme
    Court's authority to determine practice and procedure and does not
    require a literal definition of miscarriage of justice. On direct
    review, the reviewing court should not apply the standard for pre-
    served constitutional error of harmless beyond a reasonable doubt.

    1. In Michigan, the harmless-error rule is primarily embodied in
    statute, MCL 769.26; MSA 28.1096, with additional statements of the
    doctrine in a court rule, MCR 2.613(A), and an evidentiary rule,
    MRE 103. The Legislature's directive to examine the entire record
    to find whether it affirmatively appears that a miscarriage of justice
    has occurred supports the conclusion that, for the evidentiary error
    alleged in this case, reversal should be predicated by evaluating the
    error against the remaining evidence. Although the statute and
    court rules employ different articulations of what constitutes a
    harmful error, each conveys a need for a determination of
    prejudice, i.e., appellate courts should not reverse a conviction
    unless the error was prejudicial. Whether error was prejudicial,
    focuses on the nature of the error and assesses its effect in light of
    the weight and strength of the untainted evidence.

2. The view that preserved nonconstitutional error should be reviewed under the harmless beyond a reasonable doubt standard is incompatible with the history and purpose of the statute and court rules. The fundamental protections of individual liberties embodied in constitutional rights are not at issue when the error is not of constitutional dimension.

3. Although in this case admission of extrinsic evidence of the defendant's assaultive behavior was error, because the Court of Appeals correctly found overwhelming evidence of guilt, it does not affirmatively appear that there has been a miscarriage of justice, and it is unnecessary to decide the level of confidence a reviewing court must have in the harmlessness of preserved error.

Justice WEAVER, concurring, stated that, consistent with the rule that after conviction a defendant is no longer presumed innocent, the burden of showing why a judgment should be overturned should be on the defendant. MCL 769.26; MSA 28.1096 establishes a presumption that certain nonconstitutional errors are harmless, which can only be overcome by the showing of a miscarriage of justice.

Affirmed.

Justice CAVANAGH, concurring in part and dissenting in part, stated that the harmless error standard for preserved nonconstitutional error should remain harmless beyond a reasonable doubt. The error in this case was not harmless under any lesser standard.

A uniform harmless error standard should be adopted for all errors that are subject to harmless error analysis. The line between evidentiary error and constitutional error is rarely clear. Adoption of a lesser standard with respect to nonconstitutional error implicitly threatens constitutional rights. For those errors that are amenable to harmless error analysis, the harmless error standard must remain: the nontainted evidence was so overwhelming and the error so relatively insignificant that the appellate court is led to the conclusion that the actual jury would have convicted regardless of the error because there is no reasonable possibility that the error could have contributed to the verdict, i.e., the error was harmless beyond a reasonable doubt. A test for harmful error violates the constitutional guarantees of having guilt proven beyond a reasonable doubt and of having a fair trial, and should be rejected.

Under the views expressed in this case, something short of guilt beyond a reasonable doubt will suffice, translating into an impermissible directed verdict by the appellate court for the prosecution in violation of the defendant's right to trial by jury. Even under this standard, the error was not harmless. There was no physical evidence to identify the defendant as the assailant, and the unreliable

hearsay evidence cannot and should not be outcome-determinative.

Justice LEVIN, writing separately, stated that he would reverse and remand for a new trial because the error in the admission of evidence would not be harmless, but for the ineffective assistance of counsel in failing to object on hearsay grounds to other evidence offered by the prosecutor that tended to show guilt.

While the harmless error inquiry for preserved constitutional error is whether the error is harmless beyond a reasonable doubt, that is not the inquiry when the issue is whether preserved nonconstitutional error is harmless. The core concept is whether the defendant was prejudiced. If he was prejudiced, the error was harmful to him—and thus not harmless—and is error requiring reversal. The inquiry is whether the error was harmless, not whether it was harmful. Whether the accused was prejudiced is to be determined on the basis of the effect or influence of the error on the trier of fact, rather than on whether it appears that an actually innocent defendant has been convicted, or whether, on a retrial, following reversal of the defendant's conviction because the error was not harmless, another jury would assuredly convict him.

Whether error had an effect or influence on the jury is to be determined upon examination of the totality of the record. The inquiry on appellate review should not focus alone on the sufficiency of the evidence that supports the verdict finding the defendant guilty, but rather on all the evidence in the whole record, both the untainted evidence tending to show guilt and the evidence tending to create a doubt concerning guilt. On direct review, a preserved error that affects substantial rights is prejudicial to the defendant, and hence harmful to the defendant—and thus not harmless—unless the reviewing court finds that it affirmatively appears from a review of the whole record that it is highly probable that the error did not affect the factfinder's decision.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, *Richard Thompson*, Prosecuting Attorney, *Joyce F. Todd*, Chief, Appellate Division, and *Thomas R. Grden*, Assistant Prosecuting Attorney, for the people.

State Appellate Defender (by *Robyn B. Frankel*) for the defendant.

Amici Curiae:

*Donald Martin*, President, *John D. O'Hair*, Prosecuting Attorney, and *Timothy A. Baughman*, Chief, Research, Training and Appeals, for Prosecuting Attorneys Association of Michigan.

*David A. Moran* for Criminal Defense Attorneys of Michigan.

BOYLE, J. We granted leave in this case to determine the standard of review on appeal of preserved error that does not involve a constitutional claim. We hold that MCL 769.26; MSA 28.1096 does not impinge on this Court's authority to determine practice and procedure and does not require a literal definition of miscarriage of justice. On direct review, the reviewing court is not to apply the standard for preserved constitutional error of harmless beyond a reasonable doubt, *People v Anderson (After Remand)*, 446 Mich 392; 521 NW2d 538 (1994).

The statute is consistent with the view of the Court in *Kotteakos v United States*, 328 US 750; 66 S Ct 1239; 90 L Ed 1557 (1946). Under our statute, as under federal law, a reviewing court is not to find nonconstitutional preserved error harmless simply because it concludes the jury reached the right result. Disregarding errors that do not affect substantial rights, the reviewing court is to examine the record as a whole and the actual prejudicial effect of the error on the factfinder in the case at hand. *People v Lee*, 434 Mich 59; 450 NW2d 883 (1990). Where the error asserted is the erroneous admission of evidence, the court engages in a comparative analysis of the likely effect of the error in light of the other evidence.

Because in this case the Court of Appeals correctly found overwhelming evidence of guilt, it does not affirmatively appear that there has been a miscarriage of justice. *People v Straight*, 430 Mich 418; 424 NW2d 257 (1988). Given that the evidence of guilt was overwhelming, it is unnecessary to reach the question of the level of confidence the reviewing court must have in the harmlessness of preserved error. The government has briefed only the *Kotteakos* standard, and the defendant has briefed only the *Chapman* standard. *Chapman v California*, 386 US 18; 87 S Ct 824; 17 L Ed 2d 705 (1967). While the highly probable standard may represent the appropriate test for the reasons discussed below, on an issue of such overriding importance to the jurisprudence of the state, formal adoption of this standard should not be undertaken without further assistance from the bench and bar.[1] The decision of the Court of Appeals is affirmed.

---

[1] The separate opinion observes that "*Kotteakos* contains its own level of confidence and assurance tests, namely, the question is whether the error had 'substantial influence' on the trier of fact . . . ." *Post* at 259. Despite this observation, and explicit language urging this Court to "adopt wholeheartedly the approach of the United States Supreme Court in *Kotteakos*," *post* at 242, the author claims to adopt the highly probable test, but never applies that test in reaching the ultimate conclusion that Mateo was denied constitutionally effective assistance of counsel. To the contrary, in analyzing the facts of this case, the separate opinion states that it is "[a]pplying the *Kotteakos* standard," *post* at 264, to determine whether the error was harmless.

The separate opinion never establishes the relationship between the *Kotteakos* standard and the highly probable standard. If the two standards are the same, there would seem to be no need to adopt the highly probable test. If the standards are different, the analysis in the application section of the separate opinion sheds no light on how they differ. Thus, the separate opinion itself illustrates the wisdom of further argument regarding whether *Kotteakos* contains its own level of confidence, whether another level of assurance is appropriate, and how various formulations of *Kotteakos* would be applied.

I

On the date the events giving rise to this case took place, defendant, Raul Mateo, was living with Elva Lulgjurflj and their three children. Jose Cantu, Lulgjurflj's brother and the victim in this case, was temporarily living with them at the time.

Cantu testified that he and defendant got into an argument in the early morning hours on January 12, 1990. Cantu had apparently made a comment regarding whether defendant was going to move out of the house and defendant took offense. After a brief verbal exchange, defendant left the room and returned with a pistol, placed it against Cantu's head, and threatened to "blow [his] brains out." Cantu managed to knock the pistol from defendant's hand and pushed him out of the room. Defendant soon returned with a knife in each hand and repeatedly slashed Cantu in the head and arm.

Cantu managed to escape and ran to a nearby gas station. Maria Cantu, Jose Cantu's mother, testified that her son called her, told her that Mateo had cut him, that she picked him up from the gas station and took him back to her home and then to the hospital. The fact that the victim was cut was also supported by the hospital records. Two police officers also testified without objection that Cantu's sister had identified Mateo as the assailant.

Defendant was charged with assault with intent to murder,[2] felonious assault,[3] and as a second felony offender.[4]

---

[2] MCL 750.83; MSA 28.278.

[3] MCL 750.82; MSA 28.277.

[4] MCL 769.10; MSA 28.1082.

At trial, defendant presented an alibi through Crystal Blair, a former girlfriend, who testified that defendant was with her during the time the attack took place. Defendant did not testify. The prosecutor cross-examined Blair about certain phone conversations Blair had with another former girlfriend of defendant, Jennifer Brecht. Blair denied having conversations about defendant with Brecht. The prosecutor then called Brecht who, over objection, testified that Blair had called her and warned her that defendant was "very violent."

Defendant was convicted as charged. Defendant appealed, alleging that Brecht's testimony was improper rebuttal on a collateral issue. The Court of Appeals agreed. In spite of the error, however, the Court went on to conclude that the evidence against defendant was "overwhelming" and that any error in admitting Brecht's testimony "was harmless beyond a reasonable doubt."[5]

Defendant, in propria persona, filed a delayed application for leave to appeal with this Court. The application was initially held in abeyance for *People v Dunn*, 446 Mich 409; 521 NW2d 255 (1994). Following release of that case, we granted leave, limited to "(1) whether the trial court erred in permitting witness Brecht to testify as a rebuttal witness, (2) what is the appropriate standard for determining when nonconstitutional error in admitting evidence is reversible, and (3) whether any error in the admission of the testimony of witness Brecht was error requiring reversal."[6]

---

[5] Unpublished opinion per curiam, issued February 17, 1993 (Docket No. 134528), slip op at 1.

[6] 448 Mich 868 (1995).

We agree with the Court of Appeals that, in these circumstances, extrinsic evidence of defendant's assaultive behavior was error. While the nature of Blair's relationship with the defendant was relevant to her credibility, and she had testified on direct examination that their relationship was good, it is unclear how any assaultive behavior in that relationship bore on Blair's credibility. *People v Figgures*, 451 Mich 390; 547 NW2d 673 (1996). The prosecutor does not argue that Blair's testimony was prompted by fear of the defendant, but, rather, contends that the testimony was directed to revealing facts of favoritism toward the defendant. *United States v Abel*, 469 US 45, 52; 105 S Ct 465; 83 L Ed 2d 450 (1984). While the scope of rebuttal is within the trial court's discretion, we find that extrinsic evidence of defendant's assaultive behavior was error. 1 McCormick, Evidence (4th ed), § 40, p 137.

Finding preserved nonconstitutional error, we now discuss the proper standard for assessing the effect of the error.

A

The legislative framework for appellate resolution of this question has guided appellate review in criminal cases for almost fifty years. It is consistent with the Court's authority to regulate practice and procedure. Const 1963, art 6, §§ 1, 5.[7]

---

[7] Moreover, if MCL 769.26; MSA 28.1096 is not controlling on this Court for harmless error review, what about the language of MCL 768.29; MSA 28.1052 (duty of a judge at trial) or MCL 722.28; MSA 25.312(8) (standard of appellate review in child custody cases)? See *Fletcher v Fletcher*, 447 Mich 871, 876-882; 526 NW2d 889 (1994), *id.* at 890-900 (LEVIN, J., writing separately). Numerous other examples could be cited.

We are not required to decide whether our harmless error statute is a legislative attempt to supplant the Court's authority.[8] Correct construction of the statute does not dictate a literal reading of the term "miscarriage of justice." The legislative history of the former federal statute, 28 USC 391, adopted in the same time frame as the Michigan statute, indicates that review is to be rendered " 'without presuming that any error which may appear had been of necessity prejudicial to the complaining party.' " *United States v Lane*, 474 US 438, 458; 106 S Ct 725; 88 L Ed 2d 814 (1986), quoting HR Rep No. 913. This reflects the view of Secretary of War Taft that " '[n]o judgment of the court below should be reversed except for an error which the court, after hearing [sic] the entire evidence, can affirmatively say would have led [the jury] to a different verdict.' " *Id.* Likewise, our statute should not be construed to require actual innocence, but, rather, it should be viewed as a legislative directive to presume the validity of verdicts and to reverse only with respect to those errors that affirmatively appear to undermine the reliability of the verdict.

---

[8] It is argued that a harmless error rule is procedural. As Judge Traynor observes, the Morgan classification of rules of law as substance or procedure are:

"The rules which determine the legal relations between the parties when all the facts are known or assumed are rules of substance." [Quoting Morgan, *Rules of evidence: Substantive or procedural?* 10 Vand L R 467-468 (1957).] Within these terms, a harmless-error rule could hardly be deemed procedural. . . . Far from being procedural, a harmless-error rule is of a piece with substantive rules, for it too is a mandate to the judge, at this stage the appellate judge, calling for the last word on the legal effect of the findings. [Traynor, The Riddle of Harmless Error (Ohio State Univ Press, 1970), pp 39-40.]

Given that there is no inherent conflict between the statute and the standard we create today for appellate review, we should (1) affirm that reversal is not required unless an error is harmful, and (2) clarify which of the conflicting standards used in past decisions by our state courts is correct.

### B

In Michigan, the harmless-error rule is primarily embodied in statute,[9] with additional statements of the doctrine in our court rule[10] and evidentiary rule.[11] The "miscarriage of justice" language in our statute,

---

[9] No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice. [MCL 769.26; MSA 28.1096.]

[10] An error in the admission or the exclusion of evidence, an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice. [MCR 2.613(A).]

[11] (a) *Effect of erroneous ruling.* Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected, and

(1) *Objection.* In case the ruling is one admitting evidence, a timely objection or motion to strike appears of record, stating the specific ground for objection, if the specific ground was not apparent from the context; or

(2) *Offer of proof.* In case the ruling is one excluding evidence, the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked.

\*        \*        \*

as well as the date of enactment,[12] supports the conclusion that it was part of a general movement in state courts to adopt the approach of the English Judicature Act, rejecting reversals for technical errors. 3 LaFave & Israel, Criminal Procedure, § 26.6(a), pp 257-258. The Judicature Act provided that the Court of Appeals was not to order a new trial on the basis of "the improper admission or rejection of evidence" or a misdirection of the jury "unless . . . some substantial wrong or *miscarriage* has thereby been occasioned." Traynor, The Riddle of Harmless Error (Ohio State Univ Press, 1970), p 10 and n 22 (emphasis added). As Professors LaFave and Israel point out, "American appellate courts recognized that the newly adopted harmless error legislation, . . . had a different frame of reference as to different types of rights." *Id.*, p 258. With regard to error of the type covered by the English Judicature Act, the American legislation remained concerned with whether the error had resulted in a "miscarriage of justice," *id.*, e.g., whether an error had a sufficient bearing on the whole trial proceeding to require reversal. The intent of the miscarriage-of-justice standard used in such harmless-error legislation to encompass the English approach is evidenced by legislative directive to examine the entire record. *Id.*, p 259. Thus, the Legislature's directive to examine the entire record to find whether it "affirmatively

---

(d) *Plain error.* Nothing in this rule precludes taking notice of plain errors affecting *substantial rights* although they were not brought to the attention of the court. [MRE 103 (emphasis added).]

[12] Our harmless-error statute was originally enacted in 1915 PA 89, at the same time that "a substantial number of states adopted such legislation." 3 LaFave & Israel, Criminal Procedure, § 26.6(a), pp 257-258.

appear[s] that . . . a miscarriage of justice" has occurred supports the conclusion that, for the evidentiary error here alleged, reversal should be predicated by evaluating the error against the remaining evidence. "It was in the tradition of testing an evidentiary error against the remaining evidence (both for effect and relevance) that an examination of the full record was most likely to be needed." LaFave & Israel, p 259. Thus, as further noted (and as reflected in numerous cases decided under our statute):

> As for some types of error, such as the erroneous admission or exclusion of evidence, overwhelming evidence of guilt will ordinarily lead to the conclusion that the error was harmless. It would take evidence of an extraordinary quality to conclude that its erroneous admission or exclusion may have contributed to the verdict where the government had before the jury other evidence that could clearly and positively establish guilt. [*Id.*, § 26.6(b), p 269.]

The statute and court rules employ different articulations of what constitutes a harmful error—"miscarriage of justice," "inconsistent with substantial justice," "affecting substantial rights." Each conveys, however, a need for a determination of prejudice.

> [T]he rule always in effect in Michigan, both before and after enactment of the mentioned statutes and unaffected thereby, has been and is that the question of reversal is controlled by determination of whether the error was prejudicial. [*People v Nichols*, 341 Mich 311, 332; 67 NW2d 230 (1954).]

Any reliance on earlier cases for the proposition that the statutory test is whether the defendant was actually guilty, see *Soltar v Anderson*, 340 Mich 242, 244; 65 NW2d 777 (1954); *People v Bigge*, 288 Mich

417, 421; 285 NW 5 (1939), is incorrect. We have since recognized, in accord with the precedent of all sister states and federal courts, LaFave & Israel, § 26.6, p 258, that the statute and rules are merely "different articulations of the same idea: appellate courts should not reverse a conviction unless the error was prejudicial." *People v Robinson*, 386 Mich 551, 562; 194 NW2d 709 (1972).[13]

Simply stated, and employed in both federal rule and case law and state statute and court rule, reversal is only required if the error was prejudicial. That inquiry focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence. See, e.g., *People v Peterson*, 450 Mich 349, 377-378; 537 NW2d 857 (1995), amended 450 Mich 1212 (1995);  *People v Straight*, *supra* at 427; *People v Young (After Remand)*, 425 Mich 470, 505; 391 NW2d 270 (1986);  see also, e.g., *Kotteakos, supra* at 764-765; *Lane, supra* at 455-460 (Brennan, J., concurring in part and dissenting in part).[14]

---

[13] While *Robinson* recognized that the question for harmless-error review was one of prejudice, it erroneously applied the *Chapman* standard to review of nonconstitutional errors. *Id.* at 559-564. In addition, the articulation of the harmless-error test in *Robinson* was dicta. Before engaging in that discussion, the Court reversed and remanded the case for a new trial because of the admission of involuntary statements by the defendant. *Id.* at 559.

[14] Cf. *English v Caldwell*, 30 Mich 362, 364 (1874);  *Miskiewicz v Smolenski*, 249 Mich 63, 74; 227 NW 789 (1929) (the plaintiff's allegations of error, even if correct, would not be prejudicial because "had the errors not been made . . . the jury's verdict would have been the same").

II

A

The view that preserved nonconstitutional error should be reviewed under the harmless beyond a reasonable doubt standard is incompatible with the history and purpose of the statute and court rules. As noted above and explained in *Kotteakos, supra* at 759-760, the harmless-error statute analyzed in that case,[15] as well as state laws such as those enacted and currently in force in Michigan, were aimed at curbing "the general course of appellate review in American criminal causes" to reverse decisions because of the occurrence of inconsequential, technical errors. *Id.* at 759. The purpose of these statutes was stated in *Kotteakos*:

> To substitute judgment for automatic application of rules; to preserve review as a check upon arbitrary action and essential unfairness in trials, but at the same time to make the process perform that function without giving men fairly convicted the multiplicity of loopholes which any highly rigid and minutely detailed scheme of errors, especially in relation to procedure, will engender and reflect in a printed record. [*Id.* at 760.]

The triumph of judgment over technicality described above and incorporated in our own statute

---

[15] The harmless-error statute in *Kotteakos* was an earlier version of the current federal rule, 28 USC 2111, which now provides:

> On the hearing of any appeal or writ of certiorari in any case, the court shall give judgment after an examination of the record without regard to errors or defects which do not affect the substantial rights of the parties.

The current and former statutes do not differ in any respect relevant to the issue before us. See *Kotteakos, supra* at 757, for text of the version of the rule in effect at the time of that case.

provides no basis for raising the bar of confidence in the harmlessness of an error to "beyond a reasonable doubt." The fundamental protections of individual liberties embodied in constitutional rights are not at issue when the error is not of constitutional dimension.

The United States Supreme Court in *Chapman, supra* at 24, expressly limited its holding to federal constitutional errors, and the federal courts have continued to maintain a distinction in the standard of review of constitutional and nonconstitutional errors. *United States v Pirovolos*, 844 F2d 415, 425 (CA 7, 1988). Justice CAVANAGH fails to provide a persuasive reason for requiring this Court to proceed on a different course.

B

Courts have historically and correctly employed the miscarriage of justice standard by evaluating the nature of the error in light of the entire record. See, e.g., *Peterson, supra* at 377-379 (holding that errors did not affect the jury's decision to convict, and thus did not result in a miscarriage of justice); *People v Pickens*, 446 Mich 298, 334; 521 NW2d 797 (1994) (holding that error did not prejudice the defendant under the statutory miscarriage-of-justice standard); *Straight, supra* at 427 (applying the harmless-error statute, and finding proper direction in its inquiry from *Kotteakos*, the Court held that it could not "safely conclude" that the erroneously admitted evidence did not have a substantial influence on the jury's result); *Young, supra* at 505 (holding that error in admission of evidence was not harmless, quoting from *Kotteakos* for a statement of proper appellate

inquiry); *People v Wilcox*, 303 Mich 287, 296; 6 NW2d
518 (1942) (in affirming the defendant's conviction,
the Court disposed of "some slight errors" alleged by
the defendant, concluding that "even if there is any
merit to them, they could not have affected the result
or resulted in a miscarriage of justice"); *People v Lah-
nala*, 193 Mich 144, 163; 159 NW 352 (1916)
(OSTRANDER, J.) (reversing and granting a new trial for
prejudicial error, and concluding that "[i]n my opin-
ion, that is, and must always be, a miscarriage of
justice").[16]

### III

There remains an issue of the level of assurance an
appellate court on direct review must have that a pre-
served, nonconstitutional error was not prejudicial
and thus harmless.

### A

The *Kotteakos* test, as articulated by the prosecu-
tor, does not definitively settle on this question.[17]

---

[16] See also *People v Johnson*, 427 Mich 98, 115-116, n 14; 398 NW2d 219
(1986) (BOYLE, J.) (providing an outline of harmless-error review under
the federal rules, and noting that, under the then-proposed Michigan Rules
of Criminal Procedure, reversal for nonconstitutional error should only
occur where there has been proof that the alleged error prejudiced the
defendant).

[17] Federal courts have phrased the inquiry into the harmlessness of
nonconstitutional error in a variety of distinctive questions. See, e.g., *Gov-
ernment of Virgin Islands v Toto*, 529 F2d 278, 284 (CA 3, 1976) (assess-
ing whether it is *highly probable* that an alleged error did not contribute
to a verdict); *United States v Neuroth*, 809 F2d 339, 342 (CA 6, 1987)
(determining harmlessness by asking whether it is *more probable than
not*, i.e., a preponderance of the evidence, that the error did not affect the
verdict); *United States v Hawkins*, 905 F2d 1489, 1493 (CA 11, 1990)
(nonconstitutional errors "*do not* constitute grounds for reversal unless
there is a *reasonable likelihood that they affected* the defendant's substan-
tial rights"). (Emphasis added.)

Thus, as previously noted, federal courts have variously adopted tests described as a highly probable, more probable than not, and a reasonable likelihood that the error affected substantial rights. See n 15.

After rejecting the rigid *Chapman* test,[18] former Chief Justice Traynor's book on harmless error discusses two possible tests. The first test assesses whether it is *highly probable* that the challenged evidence did not contribute to the verdict.[19] The second test asks whether it is *more probable than not*, i.e., a preponderance of the evidence, that the error did not affect the verdict.[20]

After analyzing the above tests, Chief Justice Traynor argues that the highly probable test is most appropriate.

> The nebulous test of reasonableness is unlikely to foster uniformity either in the application of standards, should there be any, or in the pragmatic exercise of discretion. Discretion is at least under better control within tests that focus on the degree of probability as more probable than not, highly probable, or almost certain. I should welcome a test of high probability for harmlessness. Given an error that affected a substantial right, the judgment below is suspect. Unless the appellate court believes it highly probable that the error did not affect the judgment, it should reverse.
>
> Any test less stringent entails too great a risk of affirming a judgment that was influenced by an error. Moreover, a less stringent test may fail to deter an appellate judge from focusing his inquiry on the correctness of the result and

---

[18] See, e.g., *Commonwealth v Story*, 476 Pa 391; 383 A2d 155 (1978); Saltzburg, *The harm of harmless error*, 59 Va L R 988 (1973).

[19] See, e.g., *Government of Virgin Islands v Toto*, n 17 *supra* at 284; *United States v Ladd*, 885 F2d 954, 957-958 (CA 1, 1989); *Story*, n 18 *supra* at 424-426 (Pomeroy, J., concurring).

[20] See, e.g., *Neuroth*, n 17 *supra* at 342; *United States v Rasheed*, 663 F2d 843, 850 (CA 9, 1981).

then holding an error harmless whenever he equated the result with his own predilections.

> There are objections also to the two tests that are more stringent than that of *high probability*. If the test were the mere presence of error, appellate courts could reverse, as many did in the nineteenth century, for any error, no matter how trivial. The end result was public disaffection with the judicial process. Almost as stringent is a test that would require reversal unless the court was *almost certain* that the error did not affect the judgment. [Traynor, The Riddle of Harmless Error, *supra*, pp 34-35.]

While Justice Traynor suggests that the highly probable test strikes the appropriate balance between protecting both the public and defendants' interests in fair trials, the prosecutor has not briefed or argued the question of the level of assurance that a proper construction of *Kotteakos* requires, and the defendant has briefed and argued only that the level of assurance should be harmless beyond a reasonable doubt. Given the absence of such input, it is unwise for this Court to unilaterally adopt a definitive standard. Further, it is unnecessary to do so. The Court of Appeals properly concluded that the evidence against the defendant was overwhelming.[21] By definition, the error was harmless under any standard other than the

---

[21] The testimony at trial was unrebutted and was corroborated by the victim's statement to his mother immediately after the incident that defendant was his attacker (testimony, the evidentiary significance of which the separate opinion fails to assess), a handgun found in the bathroom, the broken bathroom door, medical treatment of the slashes, and the statement of Cantu's sister.

If the evidence is overwhelming, the error is harmless, *United States v Meneses-Davila*, 580 F2d 888 (CA 5, 1978); *United States v Hernandez-Bermudez*, 857 F2d 50 (CA 1, 1988).

*Chapman* standard rejected here as unwarranted for nonconstitutional error.[22]

In summary, (1) MCL 769.26; MSA 28.1096 is not a legislative usurpation of this Court's authority and miscarriage of justice must affirmatively appear on review of nonconstitutional preserved error. (2) Those courts analyzing preserved error in terms of their view regarding whether the defendant is guilty have been wrong. The defendant's right to a fair trial by jury requires that preserved error be reviewed in terms of its effect on the factfinder. (3) Those courts analyzing nonconstitutional error for harmlessness beyond a reasonable doubt have proceeded in error. (4) Those courts denying relief because the preserved error had only slight or negligible influence on the verdict have proceeded correctly.

Defendant's conviction is affirmed.

BRICKLEY, C.J., and RILEY, MALLETT, and WEAVER, JJ., concurred with BOYLE, J.

WEAVER, J. (*concurring*). I have signed Justice BOYLE's opinion because I believe that it is essential for this Court to establish a clear, workable standard of review for preserved, nonconstitutional error.

I write separately to state my position that MCL 769.26; MSA 28.1096 has established a presumption that this error is harmless. MCL 769.26; MSA 28.1096 provides that a judgment shall not be overturned "unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear

---

[22] The separate opinion's conclusion that Mateo's counsel was constitutionally deficient was not raised, briefed, or argued before this Court and is not properly before us for our review.

that the error complained of has resulted in a miscarriage of justice." Thus, I would place the burden of showing why the judgment should be overturned on the defendant. This approach is consistent with the rule that after conviction a defendant is no longer presumed innocent. *People v Fritch*, 161 Mich 111, 115; 125 NW 785 (1910).

This allocation of the burden of proof has been recognized by our Courts in the past:

> After a man has been convicted, the presumption of innocence, of which so much is made in our practice, attends him no longer. He has been convicted by a jury, and he has the burden of convincing . . . that the record upon which he stands convicted is open to serious question . . . . [*Id.* at 115.]

> After lawful conviction a defendant is no longer presumed innocent. He then has the burden of satisfying the reviewing court that the record upon which he was convicted discloses reversible error. [*People v Rowell*, 14 Mich App 190, 196; 165 NW2d 423 (1968).]

When a defendant has pleaded guilty and appeals arguing that "the facts elicited from defendant at the arraignment [do not] support a finding of guilty, . . . defendant has the burden of showing a miscarriage of justice." *People v Davis*, 24 Mich App 304, 305; 180 NW2d 285 (1970).

CAVANAGH, J. (*concurring in part and dissenting in part*). I concur with my colleagues that the rebuttal testimony was erroneously admitted. However, I believe that the harmless error standard for preserved nonconstitutional error should remain harmless beyond a reasonable doubt. I further believe that the error in this case was not harmless under any "lesser"

standard. Nevertheless, in order to provide the bar with one standard adopted by a majority of this Court, I would concur with the standard proposed by Justice Levin in his separate opinion.

I

Today, by distinguishing nonconstitutional error from constitutional error, this Court has added yet another category to the labyrinth of harmless error in Michigan. It has done so without explaining why, or how, the uniform standard that this Court adopted in *People v Robinson*, 386 Mich 551; 194 NW2d 709 (1972), is unsatisfactory.[1] *Robinson* restated the long-standing definition of harmless error:

> The appropriate considerations are described in *People v Wichman*, 15 Mich App 110, 116 [166 NW2d 298] (1968):

---

[1] My colleagues imply that the *Robinson* Court did not understand the significance of citing *Chapman v California*, 386 US 18; 87 S Ct 824; 17 L Ed 2d 705 (1967), when it defined its harmless error standard. I disagree. In *Robinson*, there were two primary categories of alleged errors: (1) the admission of an involuntary confession, and (2) evidentiary errors, which were the equivalent of improper bad-acts evidence. *Id.* at 556. The Court reversed the defendant's conviction on the basis of the admission of the involuntary confession, without engaging in *any* harmless error analysis. *Id.* at 559. It was within the discussion of the alleged evidentiary errors, or what would now be termed nonconstitutional errors, that *Robinson* cited *Chapman* for support of the harmless error test.

Given that *Robinson* was decided in 1972, five years after *Chapman* was decided in 1967, and twenty-six years after *Kotteakos v United States*, 328 US 750, 764; 66 S Ct 1239; 90 L Ed 1557 (1946), was decided, we must presume that this Court understood the significance of citing *Chapman* rather than *Kotteakos*. It knew then that the federal harmless error standards were different for constitutional and nonconstitutional error. If this Court had wanted to adopt such a dichotomy, it would have done so. It strains belief that any of my colleagues would suggest that this Court did not recognize what it was doing before now. In reality, my colleagues simply disagree with *Robinson*, which they should openly acknowledge, rather than undermining the work of our predecessor.

"Where it is claimed that error is harmless, two inquiries are pertinent. First, is the error so offensive to the maintenance of a sound judicial process that it never can be regarded as harmless? See *People v Bigge*, 288 Mich 417, 421 [285 NW 5] (1939); *People v Berry*, 10 Mich App 469, 474 [157 NW2d 310] (1968); *People v Mosley*, 338 Mich 559, 566 [61 NW2d 785] (1953). See also *Chapman v California*, 386 US 18, 23, 24 (87 S Ct 824; 17 L Ed 2d 705 [1967]), rehearing denied 386 US 987 (87 S Ct 1283; 18 L Ed 2d 241) [(1967)]. Second, if not so basic, can we declare a belief that the error was harmless beyond a reasonable doubt? See *People v Liggett*, 378 Mich 706, 716, 717 [148 NW2d 784] (1967); *Chapman v California, supra*." [*Robinson*, 386 Mich 562-563.]

This Court later unanimously applied the *Robinson* standard in a case with strong similarities to the instant case. *People v Belenor*, 408 Mich 244, 247; 289 NW2d 719 (1980). The *Belenor* Court held that error, like that which occurred here, was to be judged under the *Robinson* harmless beyond a reasonable doubt standard. *Id.* at 247. The Court did not engage in any discussion of whether this improper impeachment evidence was nonconstitutional error or constitutional error (perhaps as prosecutorial misconduct or as a violation of the right to a fair trial). Again, the *Belenor* Court must be presumed to have been aware of the distinction between nonconstitutional error and constitutional error and have concluded that the *Robinson* harmless error standard applied to all error that was amenable to harmless error analysis. See also *People v Howe*, 392 Mich 670, 678; 221 NW2d 350 (1974) (jury request to reread testimony).

Even if we were writing on a clean slate today, I would adopt a uniform harmless error standard for all

errors that are subject to harmless error analysis.[2] The line between evidentiary error and constitutional error is rarely clear. One prominent example is the case law involving the statement against penal interest exception to the hearsay rule. MRE 804(b)(3). That particular "evidentiary" rule's outer parameters are directly determined by the constitutional ramifications. For instance, if the statement is used to *inculpate* the accused, the defendant's constitutional right of confrontation is implicated. *People v Poole*, 444 Mich 151; 506 NW2d 505 (1993). In contrast, if the statement is used to *exculpate* the accused, the defendant's constitutional right to present a defense is implicated. *Chambers v Mississippi*, 410 US 284; 93 S Ct 1038; 35 L Ed 2d 297 (1973). When the issue is whether a hearsay statement should be admitted under MRE 804(b)(3), the *constitutional* concerns are *inseparable* from the determination whether the trial court erred in its *evidentiary* ruling. *People v Barrera*, 451 Mich 261, 279; 547 NW2d 280 (1996).

Additionally, by holding today that there is a difference between nonconstitutional error and constitutional error, this Court is opening the doors to increasing litigation, by adding yet another issue to an appellate court's analysis. This Court today telegraphs that there must be a significant difference between the harmless error standards for constitutional error and for nonconstitutional error and that the difference between the two standards will be *outcome-determinative*—for if the difference is *not* outcome-

---

[2] Some errors have been held to be "so offensive to the maintenance of a sound judicial process that [they] cannot be regarded as harmless error." *People v Bentley*, 402 Mich 121, 124; 261 NW2d 716 (1978) (unconstitutional denial of right to counsel).

determinative, then this Court has no need today to distinguish a separate standard. After today, if the Court of Appeals applies the wrong standard, and my colleagues have yet to agree on the right standard, a remand, if not reversal, *by definition*, will be required because the *difference* between the standards is outcome-determinative. Likewise, if the defense counsel erroneously argues that the error falls within the wrong category, there will be an additional, and *meritorious*, claim of ineffective assistance of counsel. My colleagues have failed to explain persuasively why this nebulous maze is necessary.

Moreover, I believe that the adoption of a "lesser" standard with respect to nonconstitutional error implicitly threatens constitutional rights. I believe that for those errors that are amenable to harmless error analysis, the harmless error standard should remain: the nontainted evidence was so overwhelming and the error was so *relatively* insignificant, that the appellate court is led to the conclusion that the actual jury would have convicted *regardless* of the error because there is no reasonable possibility that the error could have contributed to the verdict. In other words, the error was harmless beyond a reasonable doubt.

The most basic justification commanding this uniform standard is that the constitution requires that *every* factual element of guilt be proven beyond a reasonable doubt. *In re Winship*, 397 US 358, 364; 90 S Ct 1068; 25 L Ed 2d 368 (1970). In sharp contrast, under my colleagues' views, something short of proven beyond a reasonable doubt will be sufficient. This inherently translates into an appellate court

impermissibly directing a verdict for the prosecution, violating the defendant's right to a jury trial.

Starting with that axiom, I note that I am not the first to believe that a uniform standard must be applied, and I quote below the persuasive reasoning of two courts that have adopted such a standard, expressly rejecting the federal approach. The Pennsylvania Supreme Court stated in *Commonwealth v Story*, 476 Pa 391, 406-409; 383 A2d 155 (1978):

> Several considerations persuade us that the "beyond a reasonable doubt" standard is the proper standard to apply in determining the harmlessness of *any* criminal trial error. First, this standard is commensurate with the standard of proof in criminal trials—that an accused cannot be convicted unless the trier of fact is convinced beyond a reasonable doubt that the accused is guilty as charged. *In re Winship*, 397 US 358; 90 S Ct 1068; 25 L Ed 2d 368 (1970). In order to maintain the integrity of this standard, appellate courts should utilize a comparable standard in determining whether an error was harmless. Professor Saltzburg has observed:
>
> "It would make little sense to adopt the *Winship* standard, which is designed to prevent criminal convictions if there is even a reasonable doubt in the minds of jurors as to the guilt of the person charged, and then on appeal to emasculate that evidentiary standard when the trial court has violated evidentiary rules which might have influenced the jury by creating the requisite doubt. . . . [C]onvictions must be reversed where the appellate court cannot arrive at a conclusion about the impact of an error on the jury verdict with the same degree of certainty demanded at trial."
>
> Saltzburg, *The harm of harmless error*, 59 Va L Rev 988, 992 (1973).[12]
>
> Second, there are sound reasons for applying the same standard for determining harmless error whether the error violates state or federal law. State rules often implicate constitutional values, and the violation of a state rule may rise

to the level of a federal constitutional violation. The protection of constitutional rights, as well as the development of a coherent doctrine of harmless error, militate in favor of the application of the same standard for constitutional and non-constitutional errors. Because it may be unclear whether a well established state rule is also constitutionally mandated, separate harmless error standards might prove to be unworkable. Moreover, a more relaxed harmless error standard for errors perceived as violations of state rules, but which might also be violations of the federal Constitution, would leave constitutional values inadequately protected.

Third, it is irrelevant whether an error is constitutional or non-constitutional in determining whether the error is prejudicial to the accused. Constitutional errors are not inherently more injurious to an accused than errors under state law. There is no reason why a state court should apply a stricter harmless error standard to federal constitutional rules than to state rules, especially since the purpose of most state rules is to assure a fair trial.

Finally, there is the danger that a lenient harmless error rule may denigrate the interests and policies which both constitutional and non-constitutional rules promote. We are convinced that the "beyond a reasonable doubt" standard reaches the proper balance of competing considerations implicated in the harmless error rule. . . . We believe that the "beyond a reasonable doubt" standard reaches the most reasonable balance between the consideration of judicial economy and the important policies which underlie constitutional and non-constitutional rules.

Having articulated the proper standard of proof in determining whether an error is harmless, we must now address the proper definition of harmlessness, for any theory of harmless error must include both the standard of the degree to which an appellate court must be convinced that an error is harmless and the definition of harmlessness. We adopt the standard that an error cannot be held harmless unless the appellate court determines that the error could not have contributed to the verdict. Whenever there is a " 'reasonable possibility' " that an error " 'might have contributed to the conviction,' " the error is not harmless.

[12]Accord, *Commonwealth v Davis*, 452 Pa 171, 177; 305 A2d 715,
719 (1973) (citations omitted):

> "This reasonable doubt standard reflects a fundamental belief
> that once . . . error has been established, it is far worse to con-
> clude incorrectly that the error was harmless than it is to conclude
> incorrectly that the error was reversible."

[Citations omitted.]

Similarly, the Maryland Court of Appeals explained
in *Dorsey v State*, 276 Md 638, 657-658; 350 A2d 665
(1976):

> As we see it, there is no sound reason for drawing a dis-
> tinction between the treatment of those errors which are of
> constitutional dimension and those other evidentiary, or
> procedural, errors which may have been committed during
> a trial. Although the Amendments to the United States Con-
> stitution are commonly considered a source of fair judicial
> procedure, other nonconstitutional evidentiary and proce-
> dural rules, signifying state policy with respect to judicial
> fairness, are often a defendant's primary source of protec-
> tion. An evidentiary or procedural error in a trial is bound,
> in some fashion, to affect the delicately balanced, deci-
> sional process. The abnegation of a particular rule upon
> which the defense intended to rely may often inflict more
> damage than initially apparent; a meritorious line of defense
> may be abandoned as a result; an important witness may
> not be called; strategies are often forsaken. The future
> course of the trial inevitably must be changed to accommo-
> date the rulings made. It is the impact of the erroneous rul-
> ing upon the defendant's trial and the effect it has upon the
> decisional process which is of primary concern, not
> whether the error is labelled as constitutional or nonconsti-
> tutional. Invariably, a number of constitutional rights, be
> they of federal or state origin, are inexorably intertwined
> with state rules of evidence and procedure. Regardless of
> the generic nature of the error, we believe that upon appel-
> late review, a uniform test should be applied in all criminal
> cases to determine the effect the error may have had on the
> verdict. [Citation omitted.]

Later, the court noted:

> We think it worthwhile to repeat here the caveat set forth
> in *Younie v State* [272 Md 233, 248; 322 A2d 211 (1974)],
> that the harmless error rule "has been and should be care-
> fully circumscribed for the reasons given in *People v
> Jablonski*, 38 Mich App 33, 39; 195 NW2d 777, 780 (1972),
> where it is said that:
> 'Continued expansion of the harmless error rule will
> merely encourage prosecutors to attempt to get such testi-
> mony in, since they know that, if they have a strong case,
> such testimony will not be considered to be reversible
> error, yet if they have a weak case, they will use such testi-
> mony to buttress the case to gain a conviction and then
> hope that the issue is not raised on appeal.' " [*Dorsey*, 276
> Md 661.]

For all these reasons, I would maintain the *Robin-son* course in Michigan of using a uniform harmless error standard for preserved errors that are subject to harmless error analysis.

II

Although Justice BOYLE declines to adopt a standard, and consequently the remainder of her opinion is dicta, she does hint at her view of what that standard should and should not be.

I do not disagree with Justice BOYLE that where a reviewing court affirmatively[3] finds that a preserved, nontechnical error did not prejudice the defendant it should not reverse. Nor do I disagree that where a reviewing court affirmatively finds that such error did prejudice the defendant it must reverse. However,

---

[3] For the sake of argument, I am assuming that "affirmatively finds," which I interpret as a confident and positive assertion, equates with "finding beyond a reasonable doubt."

Justice BOYLE and I disagree with respect to the cases that fall in between those two extremes.

The issue then becomes, on which side should the reviewing court land. In those cases where the reviewing court is not sure whether the error was harmful or harmless, I believe that the constitutional guarantees to the defendant leave the reviewing court no choice but to err on the side of caution and reverse. In contrast, Justice BOYLE seems to suggest that the reviewing court may affirm a conviction even if it cannot affirmatively say that the error was harmless. This is not correct. The question always must be whether an error was *harmless.*

The reviewing court should start its analysis from the premise that a preserved error *requires* reversal *unless* it finds under the requisite level of confidence that the error was harmless. It should not start from the premise that reversal is *not* required *unless* it finds that such error was harmful. Justice BOYLE's statements suggest that, when in doubt, the reviewing court should side with the prosecutor. This is a misreading of the harmless error standard advocated by Justice Traynor to which Justice BOYLE alludes.[4]

I believe that a test for *harmful* error violates the constitutional guarantees to the defendant of having guilt proven beyond a reasonable doubt and of having a fair trial. Accordingly, I would reject any such approach.

---

[4] Justice BOYLE quotes from Justice Traynor:

"Unless the appellate court believes it highly probable that the error did *not* affect the judgment, it should *reverse.*" [*Ante* at 219 (citation omitted and emphasis added).]

III

Turning now to the instant case, I agree with the separate opinion that under the *Robinson* harmless beyond a reasonable doubt standard, the error here was not harmless. Accordingly, I would reverse the conviction. However, even under a "lesser" standard, I believe that the error was not harmless.

The separate opinion states that if "the whole record" consisted of the testimony of the victim Jose Cantu, the defense witness Crystal Blair, and the improper rebuttal testimony of Jennifer Brecht, it would hold that the error required reversal. *Post* at 264. However, by adding in the hearsay statement of the victim's sister Elva Lulgjurflj, the separate opinion finds that the error becomes harmless. I cannot agree with this latter conclusion.

Cantu testified that he had been staying temporarily with Lulgjurflj. Defendant Mateo was also living there, as well as Lulgjurflj's and Mateo's three children. At around 12:15 A.M. on the night of the assault, Cantu brought home a friend, Darrell Wilder, to play cards. Cantu alleged that after playing cards for up to three hours, he heard Mateo arrive home. Cantu then asked his friend to leave.

Cantu testified that (while he was brushing his teeth in a bathroom) Mateo instigated an exchange with him about when he would be moving out. Mateo then retrieved a small silver gun from a nearby bedroom and threatened Cantu by placing the gun next to his chin. Cantu then slapped the gun out of Mateo's hand, and it landed under the sink or on the floor. (Police officers recovered the gun from the sink.) Cantu testified that he pushed Mateo out of the bathroom and closed the door. Mateo quickly returned

with a steak knife in each hand and proceeded to knock the door down. Cantu sustained several cuts in the ensuing attack until he was able to escape out the front door of the house and run down the street to a gas station.

Mateo's defense was alibi, presenting the testimony of Blair who stated that Mateo was with her at the time of the assault.

My colleagues properly find sufficient evidence that Cantu was assaulted by someone. However, I cannot agree with the separate opinion that the straw that tips the scales in favor of the prosecution can be the hearsay statement of Lulgjurflj. Even if a reviewing court *can* properly consider unobjected-to hearsay statements—and I emphasize that this issue of first impression was neither briefed nor argued by the parties in this case—a hearsay statement that fails to fit within an exclusion or exception to the hearsay rule remains hearsay. It is inherently unreliable evidence.[5]

---

[5] As this Court has held:

> A witness' perception of persons and events, the clarity and accuracy of the witness' memory, and the lucidity of the witness' description of persons and events are critical in evaluating the credibility of testimony. The law requires that witnesses be present at trial, take an oath of truthfulness and be subject to cross-examination so that their credibility may be properly evaluated. The admission of hearsay evidence is disfavored because it is difficult, if not impossible, for the trier of fact to assess the reliability of hearsay statements or of the hearsay declarant. The trier of fact is unable to view and evaluate the demeanor and manner of the declarant while making the hearsay statement. The hearsay statement has not been vouched and thus the declarant may not have felt the "special obligation to tell the truth" that results from the taking of an oath. Most importantly, there is no opportunity for cross-examination of the declarant regarding the content of the hearsay statement. [*Poole*, 444 Mich 160.]

Moreover, on the facts in this case, the statement is especially unreliable.

Foremost, we should note that the officers did not attempt to retrieve fingerprints from the gun. They recovered it from the sink, although Cantu testified that it fell under the sink or on the floor. More importantly, the officers did not conduct a thorough search of the scene and never recovered any bloody knives—and, in fact, probably never entered the kitchen, where the last part of the assault allegedly occurred, even though it was only about ten feet from the bathroom. In sum, there was no physical evidence to identify Mateo as the assailant.

Additionally, the officers did not write down Lulgjurflj's statement, even though it was customary to do so. Their only notes with respect to her statement were that she confirmed Cantu's story. Their express testimony is informative.

Officer Wendy Keelty testified:

> *Q.* And who did [Cantu] say did this to him?
> *A.* He said—he stated his sister's boyfriend, Raul.
> *Q.* And did the sister confirm that also?
> *A.* Yes, she did.

Officer Eulalio Reyes testified:

> *Q.* And did you also see his sister, by the name of Alva [sic], at the mother's home?
> *A.* Yes, I did.
>
> \*      \*      \*
>
> *Q.* And did she tell you who did this?
> *A.* Yes, she did.
> *Q.* And who did she say?
> *A.* Raul Mateo.

On redirect Officer Reyes further testified:

> *Q.* And what did you put in your police report in regards to his sister?
>
> *A.* That she stated the same as the victim and that she was the girlfriend of the responsible.
>
> *Q.* So you put two things, that she stated the same thing as the victim did about the incident?
>
> *A.* Correct.
>
> *Q.* And that she was the girlfriend of Raul Mateo?
>
> *A.* Correct.
>
> *Q.* And those are the only two things you put in the report, is that correct?
>
> *A.* Yes, it is.

Further, the detective in charge of the case, Santiago Serna, testified that Lulgjurflj refused to cooperate in the investigation.

> *Q.* Did you also attempt to contact his sister, Alva?
>
> *A.* Yes.
>
> *Q.* And did you want her to make a statement, a written statement?
>
> *A.* I wanted to meet with her. And the only time I met with her is when I served the subpoena. She did not want to cooperate with me at all.
>
> I could not get her to talk to me about anything.
>
> *Q.* Now at that time were you aware that she had children by the defendant?
>
> *A.* Yes, I was.
>
> *Q.* Now how many times did you serve a subpoena on Alva?
>
> *A.* Yesterday . . . was the fourth time that I served the subpoena. . . .
>
> *Q.* Did she ever appear in court pursuant to any of the subpoenas that you've served upon her?
>
> *A.* No, she has not.

Moreover, the separate opinion fails to note that Cantu himself testified that Lulgjurflj could not have seen the stabbing during the assault because she was shut in another room. Most importantly, the trial judge, who was listening firsthand to the parties involved, did not believe that Lulgjurflj's testimony would assist the prosecutor:

> *The Court*: Certainly. And you think she would testify for the People . . .
>
> [*The Prosecutor*]: If she was here . . .
>
> *The Court*: It doesn't sound like it from what the detective said. And [after] all of your investigation, she refuses to come in.

Lulgjurflj was the mother of three of Mateo's children. The trial testimony revealed that he had other girlfriends during their time together. Lulgjurflj's mother's testimony clearly indicated that this was no secret. If Cantu had a motive to lie, as implicitly recognized by the separate opinion, I believe that Lulgjurflj may have had an even stronger motive to lie. Perhaps Lulgjurflj was angry with Mateo on the night in question and had a retaliatory motive in identifying him as the assailant. Or perhaps, Lulgjurflj did not see the assault at all and out of loyalty to her brother merely repeated what her brother had related to her.

Nevertheless, the reliability of Lulgjurflj's statement was not tested through cross-examination. Further, in light of the fact that it was not reduced to written form, there is a likely possibility that at the time of the trial the officers did not completely remember her statement, which had been spoken to them six months earlier.

The bottom line is that this particularly unreliable hearsay statement cannot and should not be the outcome-determinative fact in this case. I believe that the separate opinion is focusing on an incorrect premise. There was not overwhelming evidence of the defendant's guilt. The only evidence identifying the *defendant* as the assailant was Cantu's testimony and the police officers' testimonies restating Cantu's and his sister's statements. In contrast, the defendant presented his alibi witness. If the sister's statement was cumulative or merely derivative of Cantu's statement, a jury confronted with two opposing versions of the events at issue would obviously be swayed by improper and highly prejudicial rebuttal testimony that both painted the alibi witness as a liar and painted Mateo's character as one prone to assaultive violence.[6] Absent eyewitness *testimony* from a third party or corroborating physical evidence of identity, this Court cannot, under any standard, say that the erroneously admitted testimony did not affect the jury's decision and influence the result.

In sum, I would reverse.

Levin, J. (*separate opinion*). I am in substantial agreement with the majority concerning the harmless error standard for preserved nonconstitutional error.

I would, however, decide the question of the level of assurance that an appellate court must have that

---

[6] Justice Boyle refers to Cantu's statement to his mother. *Ante* at 208. However, this statement would still be nothing more than a cumulative restatement of Cantu's version of the events. It was not based on any independent knowledge on his mother's part.

the error was not prejudicial and thus harmless, a question that the majority puts off until another day.

Further, I would not reformulate "miscarriage of justice" to preserve some legitimacy for the statutory standard, but, rather, would declare a harmless error standard for preserved error applicable on direct review of judgments in criminal and civil cases alike. I would do so in the exercise of the Court's authority under the constitution, which confers the "judicial power of the state" on "one court of justice" headed by this Court,[1] and which confers on this Court "appellate jurisdiction as provided by rules of the supreme court,"[2] and which provides that "[t]he supreme court shall by general rules establish, modify, amend and simplify the practice and procedure in all courts of this state."[3]

I

I agree with the majority that the standard on review for nonconstitutional error is not whether the error is harmless "beyond a reasonable doubt." I further agree that the harmlessness of preserved error should be "reviewed in terms of its effect on the factfinder,"[4] and that a reviewing court should engage "in a comparative analysis of the likely effect of the error in light of the other evidence,"[5] and that the judgment entered by the trial court should be

[1] Const 1963, art 6, § 1.
[2] Const 1963, art 6, § 4.
[3] Const 1963, art 6, § 5.
[4] *Ante*, p 221.
[5] *Id.*, p 206.

affirmed if the "error had only slight or negligible influence on the verdict . . . ."[6]

Although the majority speaks of error that is harmful[7] as well as error that is harmless, it is clear, I think, that the majority and I are in agreement that if the error affects a substantial right of a defendant in a criminal case, and was prejudicial to the defendant and affected the verdict, that the error was harmful and hence not harmless.

As I read the majority opinion,

- "affirmatively appears" means what the reviewing court has found from an examination of the whole record;

- there has been "miscarriage of justice" if the error affects a substantial right of the defendant, and was prejudicial or harmful to the defendant;

- The reviewing court should find that the error is prejudicial or harmful to the defendant unless it can state that it affirmatively appears from an examination of the whole record that the error did not affect the factfinder's decision.[8]

---

[6] *Id.*, p 221.

[7] [R]eversal is not required unless an error is harmful. [*Id.*, p 212.]

[8] Justice Scalia, writing for a unanimous court in a constitutional error case, said that the harmless error inquiry concerns the effect of the error on the jury that was actually impaneled, not the effect on a hypothetical jury:

The most an appellate court can conclude is that a jury would surely have found petitioner guilty beyond a reasonable doubt—not that the jury's actual finding of guilty beyond a reasonable doubt would surely not have been different absent the constitutional error. That is not enough. See *Yates* [*v Evatt*, 500 US 391, 403-404;

I would, reaching the level of confidence or assurance question, hold that

- While the harmless error inquiry for preserved constitutional error is whether the error is harmless beyond a reasonable doubt, that is not the inquiry when the issue is whether preserved nonconstitutional error is harmless.

- The core concept is whether the defendant was prejudiced. If he was prejudiced, the error was harmful to him—and thus not harmless—and is error requiring reversal.

- The inquiry is whether the error was harmless, not whether it was harmful.

- Whether the accused was prejudiced is to be determined on the basis of the effect or influence of the error on the trier of fact, rather than on whether it appears that an actually innocent defendant has been convicted, or whether, on a retrial, following reversal of the defendant's conviction because the error was not harmless, another jury would assuredly convict him.[9]

---

111 S Ct 1884; 114 L Ed 2d 432 (1991)] (Scalia, J., concurring in part and concurring in judgment). The Sixth Amendment requires more than appellate speculation about a hypothetical jury's action, or else directed verdicts for the State would be sustainable on appeal; it requires an actual jury finding of guilty. See *Bollenbach v United States*, 326 US 607, 614 [66 S Ct 402; 90 L Ed 350] (1946). [*Sullivan v Louisiana*, 508 US 275, 280; 113 S Ct 2078; 124 L Ed 2d 182 (1993).]

[9] See n 4; *Kotteakos v United States*, 328 US 750, 759, 763; 66 S Ct 1239; 90 L Ed 1557 (1946).

- Whether error had an effect or influence on the jury is to be determined upon examination of the totality of the record.[10]

- The inquiry on appellate review should not focus alone on the sufficiency of the evidence that supports the verdict finding the defendant guilty, but rather on all the evidence in the whole record, both the untainted evidence tending to show guilt and the evidence tending to create a doubt concerning guilt.

- On direct review, a preserved error that affects substantial rights is prejudicial to the defendant, and hence harmful to the defendant—and thus not harmless—unless the reviewing court finds that it affirmatively appears from a review of the whole record

---

[10] In *Kotteakos*, the Court said:

[T]his does not mean that the appellate court can escape altogether taking account of the outcome. To weigh the error's effect against the entire setting of the record without relation to the verdict or judgment would be almost to work in a vacuum. . . . In criminal causes that outcome is conviction. This is different, or may be, from guilt in fact. It is guilt in law, established by the judgment of laymen. And *the question is, not were they right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error had or reasonably may be taken to have had upon the jury's decision.* The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting. . . .

This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions not by his own, but with allowance for how *others might react and not be regarded generally as acting without reason.* This is the important difference, but one easy to ignore when the sense of guilt comes strongly from the record. [*Id.,* n 9 *supra,* pp 764-765 (emphasis added).]

that it is highly probable that the error did not affect the factfinder's decision.

## II

We granted leave to appeal to consider and decide what is the appropriate standard for determining when preserved nonconstitutional error in admitting evidence requires reversal.[11] We should adopt wholeheartedly the approach of the United States Supreme Court in *Kotteakos v United States*, 328 US 750, 759; 66 S Ct 1239; 90 L Ed 1557 (1946), applicable in determining whether nonconstitutional error in a trial in a federal court is harmless.

We should conclude, in agreement with the prosecutor and amicus curiae Prosecuting Attorneys Association of Michigan, that the appropriate standard is not the *Chapman*[12] standard, whether the error was harmless "beyond a reasonable doubt," but, rather, the standard set forth in *Kotteakos*.

As stated in *Kotteakos*, "a conviction cannot stand" unless the reviewing court can say

- "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the [jurors'] judg-

---

[11] 448 Mich 868 (1995). Mateo's application for leave to appeal was held in abeyance pending this Court's decision in *People v Dunn*, 446 Mich 409; 521 NW2d 255 (1994). *Dunn* did not decide the appropriate standard for determining when nonconstitutional error requires reversal. This Court resolved the pending abeyance in this case by entering an order granting leave to appeal, limited to the issues "(1) whether the trial court erred in permitting witness Brecht to testify as a rebuttal witness, (2) what is the appropriate standard for determining when nonconstitutional error in admitting evidence is reversible, and (3) whether any error in the admission of the testimony of witness Brecht was error requiring reversal."

[12] *Chapman v California*, 386 US 18; 87 S Ct 824; 17 L Ed 2d 705 (1967).

ment was not substantially swayed by the error," or

- "the conviction is sure that the error did not influence the jury, or had but very slight effect . . . ."

If the reviewing court is *"left in grave doubt"* whether the jurors' judgment was "substantially swayed by the error" or whether the error did substantially "influence the jury or had but very slight effect" the conviction cannot stand.[13] (Emphasis added.)

Most recently, in *O'Neal v McAninch,* 513 US 432, 436; 115 S Ct 992; 130 L Ed 2d 947 (1995), the United States Supreme Court held, in explication of the "grave doubt" component of the *Kotteakos* standard, that a defendant seeking relief from conviction in a criminal case does not have the burden of establishing whether error was prejudicial. Declining to phrase the issue in terms of burden of proof, the Court declared that if the reviewing court "is in grave doubt" about whether the error had *"substantial and injurious effect or influence in determining the jury's verdict,"* the error is not harmless.

The three dissenting justices in *O'Neal* had no "quarrel with the majority's conclusion that once an error has been shown on *direct appeal,* the government must demonstrate that it was harmless if the conviction is to stand."[14] (Emphasis added.)

---

[13] *Kotteakos, supra,* pp 764-765.

[14] *Id.,* 513 US 448.

Amicus curiae Prosecuting Attorneys Association of Michigan agrees, and further agrees that the power to determine the harmless error standard for preserved nonconstitutional error, except where the error alleged is a failure to observe a mandate *created* by statute, is "committed to the

III

Mateo was convicted of assault with intent to murder,[15] felonious assault,[16] and of being an habitual offender, second offense.[17]

We agree with the Court of Appeals[18] that the trial court erred in permitting Jennifer Brecht to testify over objection as a rebuttal witness to the testimony of Crystal Blair, a witness for Mateo. The Court of Appeals found that the error was "harmless beyond a reasonable doubt."

A

Mateo was living with Elva Lulgjurflj and their three children. Lulgjurflj's brother, Jose Cantu, was living with them temporarily. Cantu testified that he and Mateo became involved in an argument early in the morning concerning whether Cantu would be moving out. Cantu said that Mateo threatened to blow Cantu's brains out with a pistol and slashed him repeatedly with a knife. Hospital records verified the slashes.

Cantu's testimony identifying Mateo as his assailant was supported by hearsay testimony, for which no

---

judicial branch of government," and thus the literal language of § 26, ch IX of the Code of Criminal Procedure (see n 30) is not controlling.

*O'Neal*, in contrast with the instant case, was not a direct appeal, but rather a federal habeas corpus proceeding, requiring that the petitioner establish a violation of the federal constitution or a federal statute. The dissenters would have required a federal habeas corpus petitioner to bear the burden of persuasion that the error caused harm and that the error was prejudicial.

[15] MCL 750.83; MSA 28.278.

[16] MCL 750.82; MSA 28.277.

[17] MCL 769.10; MSA 28.1082.

[18] Unpublished opinion per curiam issued February 17, 1993 (Docket No. 134528), slip op, p 1.

objection was raised, by two police officers who indicated that Lulgjurflj told them shortly after the assault that Mateo was the person who assaulted Cantu.

B

Mateo did not testify. He presented an alibi through Crystal Blair, who said that Mateo was with her when the assault was alleged to have taken place.

The prosecutor cross-examined Blair concerning conversations with Jennifer Brecht, who also had been a girlfriend of Mateo. Blair denied having conversations with Brecht about Mateo. Blair said she only spoke with Brecht when she telephoned to talk with Mateo when Mateo was living with Brecht. The prosecutor then called Brecht who, over objection, testified that Blair had telephoned Brecht and warned that Mateo was "very violent."

C

The Court of Appeals held that Brecht's testimony was improper because it impeached Blair on a collateral matter rather than a material issue.[19] The Court added that the prosecutor may not elicit a denial from a witness on cross-examination "only to inject a new issue on rebuttal."[20] The Court continued that the

---

[19] The Court of Appeals cited *People v Holland*, 179 Mich App 184, 193; 445 NW2d 206 (1989). See n 18.

[20] *Id.*, slip op, p 1. The Court again cited *Holland*, n 19 *supra*, p 194. The Court in *Holland* said:

Rebuttal testimony is that used to contradict, repel, explain, or disprove evidence produced by the other party, tending directly to weaken or impeach the same. *People v Kelly*, 423 Mich 261, 281; 378 NW2d 365 (1985). There are, however, limitations. First, if the evidence should have been introduced in the case in chief, rebuttal is improper. *People v Losey*, 413 Mich 346, 351; 320 NW2d 49

prosecutor apparently asked Blair about the assault during cross-examination to interject evidence of prior assaultive acts by Mateo and to "set-up" Blair for the purpose of impeaching her credibility with prior inconsistent statements.

I agree with the Court of Appeals that it was error to admit the rebuttal testimony of Brecht, both because it involved impeaching a witness on a collateral matter, and also because the inconsistency was created by eliciting a denial on cross-examination.[21]

D

The Court of Appeals found that the error was "harmless."

> The victim testified that defendant assaulted him with a knife and a gun. The victim's sister who witnessed the assaults confirmed his version of the events to the investigating officers. The victim was treated for multiple lacerations and a handgun was recovered from the bathroom where the assault took place. Further, the officers noted that the bathroom door had been broken.[22] In light of the

---

(1982). Second, rebuttal evidence must be on a material matter, not a collateral issue. *People v Teague*, 411 Mich 562, 566; 309 NW2d 530 (1981). Third, if the evidence was not raised in the prosecutor's case in chief, the defense must have raised a new issue. The prosecutor is not allowed to elicit a denial from the defendant on cross-examination only to inject a new issue on rebuttal or revive the right to introduce evidence that should have been introduced in the case in chief. *People v Bennett*, 393 Mich 445, 449-450; 224 NW2d 840 (1975). [*Id.*, pp 193-194.]

[21] See *People v McGillen No 1*, 392 Mich 251; 220 NW2d 677 (1974); *People v Bennett*, n 20 *supra*.

[22] The Court of Appeals added:

Intent to murder may be inferred from the facts and circumstances. *Id.* The victim testified that defendant held a handgun under the victim's chin and told him that he was going to "blow his brains out." After the victim knocked the gun out of defendant's

overwhelming evidence against defendant, the improper
rebuttal testimony was harmless. [Unpublished opinion per
curiam, issued February 17, 1993 (Docket No. 134528), slip
op, p 1.]

IV

Mateo contends that a reviewing court should
assess the harmlessness of the error under the harm-
less-beyond-a-reasonable-doubt standard announced
by the United States Supreme Court in *Chapman v
California*, 386 US 18, 24; 87 S Ct 824; 17 L Ed 2d 705
(1967). The Court there held that "before a *federal
constitutional error* can be held harmless, the court
must be able to declare a belief that it was harmless
beyond a reasonable doubt" (emphasis added), and
that the repeated references to the defendants' failure
to testify did not constitute harmless error.[23]

---

hand and locked the bathroom door, defendant smashed in the
upper door panel and started swinging two steak knives at the vic-
tim. When the victim attempted to flee, defendant cut him off and
continued swinging the knives, cutting the victim twice in the head
and once on the chin and hand, all requiring sutures. [*Id.*, slip op, p
2.]

[23] The Court said that although the government had "presented a rea-
sonably strong 'circumstantial web of evidence' against petitioners, 63 Cal
2d [178, 197; 404 P2d 209, 220 (1965)]," "absent the constitutionally forbid-
den comments, honest, fair-minded jurors might very well have brought in
not-guilty verdicts." *Chapman v California, supra*, pp 25-26.

Nearly twenty-five years after *Chapman* was decided, the United States
Supreme Court, in *Arizona v Fulminante*, 499 US 279, 307; 111 S Ct 1246;
113 L Ed 2d 302 (1991), characterized some constitutional errors as "trial
error," subject to harmless-error analysis, and other constitutional errors
as "structural defects" that "defy analysis by 'harmless-error standards.' "

Two years later, in *Sullivan v Louisiana*, 508 US 275; 113 S Ct 2078; 124
L Ed 2d 182 (1993), the United States Supreme Court ruled, on direct
appeal from the Supreme Court of Louisiana, that a constitutionally defi-
cient criminal jury instruction concerning the definition of reasonable
doubt, was structural error not amenable to harmless-error analysis.

In the instant case, the error in admitting Brecht's statements was not federal constitutional error.[24] While, as Mateo contends, this Court has employed the *Chapman* harmless-beyond-a-reasonable-doubt formulation in cases in which the error did not constitute federal constitutional error,[25] in none of those cases did this Court consider that the *Chapman* standard enunciated by the United States Supreme Court is not applied by that Court when the error is not of constitutional dimension.

A

Over twenty years before *Chapman* was decided, the United States Supreme Court, in *Kotteakos*, construed the federal harmless-error statute[26] applicable in reviewing error occurring during the course of a federal civil or criminal trial.

---

[24] Mateo and amicus curiae Criminal Defense Attorneys of Michigan argue that the distinction between constitutional and nonconstitutional violation is not easily drawn, and the overlap supports the adoption of a single, beyond-a-reasonable-doubt standard. We are not persuaded that because the task may at times be daunting that it would be responsible to ignore the cost to the administration of justice of so simply cutting the Gordian knot.

[25] *People v Liggett*, 378 Mich 706, 717; 148 NW2d 784 (1967); *People v Robinson*, 386 Mich 551, 563; 194 NW2d 709 (1972); *People v Cash*, 419 Mich 230, 249; 351 NW2d 822 (1984).

But see the opinion in *People v Lee*, 434 Mich 59, 86, 123; 450 NW2d 883 (1990) (opinions of BRICKLEY and BOYLE, JJ.); *People v Straight*, 430 Mich 418, 427; 424 NW2d 257 (1988); *People v Johnson*, 427 Mich 98, 115; 398 NW2d 219 (1986) (BOYLE, J.).

[26] On the hearing of any appeal, certiorari, writ of error, or motion for a new trial, *in any case, civil or criminal,* the court shall give judgment after an examination of the entire record before the court, without regard to technical errors, defects, or exceptions which do not affect the substantial rights of the parties. [Section 269 of the Judicial Code, 28 USC 391, enacted in 1919 (40 Stat 1181) (emphasis added).]

The Michigan harmless-error statute,[27] first enacted in 1915, and the federal harmless-error statute, first enacted in 1919, have a common history.[28] The United States Supreme Court, in *Kotteakos*, said that it was "not necessary to review in detail the history of the abuses which led to the agitation or of the progress of the legislation" resulting in the enactment of the federal harmless-error statute, and that "anyone familiar with it knows that" that legislation "*and similar*

---

[27] Four years before the enactment of the federal harmless-error statute, the Legislature enacted the following law:

No judgment or verdict shall be set aside or reversed, or a new trial be granted by any court of this State *in any case, civil or criminal,* on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless, in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a *miscarriage of justice.* [1915 PA 89 (emphasis added).]

This provision was codified in the Code of Criminal Procedure, 1927 PA 175, ch IX, § 26, with the substitution of "in any criminal case" for "in any case, civil or criminal." The language so enacted, which has continued to remain in force without amendment to the present, provides as follows:

No judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state *in any criminal case,* on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a *miscarriage of justice.* [MCL 769.26; MSA 28.1096 (emphasis added).]

The language of the original Michigan harmless-error statute (1915 PA 89) was enacted as a section of the Judicature Act of 1915, 1915 PA 314, ch L, § 28, with the substitution of "in any civil case" for "any case, civil or criminal." This language was carried forward through 1948 CL 650.28, but was not continued in the Revised Judicature Act of 1961. Language respecting civil harmless error was continued forward as GCR 1963, 529.1, which is set forth in n 31.

[28] The Michigan harmless error statute, as first enacted in 1915, applied in both civil and criminal trials. See n 27 for the text of the 1915 statute.

*state legislation* grew out of widespread and deep conviction over the general course of appellate review in American criminal causes."[29] (Emphasis added.)

B

The Michigan harmless-error statute[30] and court rule[31] express, as stated in *People v Robinson*, 386 Mich 551, 562; 194 NW2d 709 (1972), essentially the

---

[29] *Kotteakos, supra,* p 759.

[30] See n 27 for the text of the original Michigan harmless-error statute, enacted as 1915 PA 89, and for the text of the harmless-error statute enacted as part of the Code of Criminal Procedure, as 1927 PA 175, ch IX, § 26, which remains in force without amendment to the present as MCL 769.26; MSA 28.1096.

[31] GCR 1963, 529.1 was modeled on FR Civ P 61, and read as follows:

No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court *inconsistent with* substantial justice. The court at every stage of the proceeding shall construe these rules to secure the just, speedy, and inexpensive determination of every action so as to avoid the consequences of any error or defect in the proceeding which does not affect the *substantial rights* of the parties. [Emphasis added.]

The current civil rule reads as follows:

An error in the admission or the exclusion of evidence, an error in a ruling or order, or an error or defect in anything done or omitted by the court or by the parties is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court *inconsistent with substantial justice.* [MCR 2.613(A) (emphasis added).]

The Michigan Rules of Evidence, modeled on the Federal Rules of Evidence, state essentially the same concept:

(a) *Effect of erroneous ruling.* Error may not be predicated upon a ruling which admits or excludes evidence unless a *substantial right* of the party is affected, and

*          *          *

same concept. This Court observed in *Robinson* that the "strictures" of the statute and the court rule are but "different articulations of the same idea," and stated that "same idea" as follows:

> [A]ppellate courts should not reverse a conviction unless the error was prejudicial. As stated in [*People v*] *Nichols* [341 Mich 311; 67 NW2d 230 (1954)] ". . . the rule always in effect in Michigan, . . . has been and is that the question of reversal is controlled by determination of *whether the error was prejudicial*." [*Id.*, p 562 (emphasis added).]

In *Nichols*, the case cited in *Robinson*, the prosecutor had urged that "the entire record is persuasive of defendant's guilt." The Court responded, citing a civil case, *Soltar v Anderson*, 340 Mich 242; 65 NW2d 777 (1954), where, as stated in *Nichols*, this Court had held that "the rule always in effect in Michigan, both before and after the enactment of the mentioned statutes *and unaffected thereby*, has been and is that the question of reversal is controlled by determination of whether the error was prejudicial . . . ." *Id.*, p 332 (emphasis added).[32]

---

(d) *Plain error.* Nothing in this rule precludes taking notice of plain errors affecting *substantial rights* although they were not brought to the attention of the court. [MRE 103 (emphasis added).]

[32] In *Soltar, supra,* p 244, it was urged that instructional error in a civil case should not result in reversal because it did not " 'affirmatively appear that the error complained of has resulted in a miscarriage of justice' . . . ." The defendant contended "that an examination of the entire cause discloses the verdict to be in accord with justice." This Court responded:

> *The statute is ineffective to change the rule always in effect in Michigan, both before and after the enactment, that the question of reversal is controlled by determination of whether the error was prejudicial.* [Emphasis added.]

In *People v Bigge*, 288 Mich 417, 421; 285 NW 5 (1939), this Court said respecting the provision of the 1927 statute concerning harmless error in a criminal case (which has not been changed by subsequent legislation, see n 27):

> The responsibility of maintaining the right of fair trial and due process of law is placed with the judicial branch and cannot be otherwise by legislative permission. We are not concerned with the guilt or innocence of the accused, for we are not triers of the facts and must apply the law to the case as tried.

The foregoing statements of this Court over forty years ago in *Nichols*, *Soltar*, and *Bigge* find support in the following statement by the United States Supreme Court in *Kotteakos*:

> [*I*]*t is not the appellate court's function to determine guilt or innocence. Nor is it to speculate upon probable reconviction* . . . . [*Id.*, p 763 (citations omitted; emphasis added).]

V

Having in mind the Michigan pre-*Chapman* harmless-error standard—whether the error was prejudicial—and the common history of enactment of the federal and Michigan harmless-error statutes, I am persuaded that the harmless-error standard announced in *Kotteakos* by the United States Supreme Court in the construction of the federal harmless-error statute should be adopted by this Court as the harmless-error standard to be applied when appellate courts of this state review preserved nonconstitutional error.

As stated at the outset of this opinion, I would adopt the harmless-error standard stated in *Kotteakos*, that a finding or verdict of guilty is required to be set aside and a new trial granted unless the reviewing court can say

- "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the [jurors'] judgment was not substantially swayed by the error," or

- "the conviction is sure that the error did not influence the jury, or had but very slight effect."

If the reviewing court is *"left in grave doubt"* whether the jurors' judgment was "substantially swayed by the error" or whether the error did substantially "influence the jury or had but very slight effect" the conviction cannot stand.[33] (Emphasis added.)

---

[33] The full text of the paragraph in *Kotteakos* from which the standard I would adopt is derived, reads as follows:

> If, when all is said and done, the conviction is sure that the *error did not influence the jury, or had but very slight effect,* the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm or a specific command of Congress. But if one cannot say, with *fair assurance,* after pondering all that happened without stripping the erroneous action from the whole, that *the judgment was not substantially swayed by the error,* it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is *left in grave doubt,* the conviction cannot stand. [Emphasis added; citations omitted.]

See also *United States v Lane,* 474 US 438, 450; 106 S Ct 725; 88 L Ed 2d 814 (1986), in which the United States Supreme Court found that "[i]n

Recently, in *Brecht v Abrahamson*, 507 US 619; 113 S Ct 1710; 123 L Ed 2d 353 (1993), the United States Supreme Court held that the use of the accused's post-*Miranda* warning silence for impeachment purposes, while violative of the Due Process Clause, would, because the question arose in a habeas corpus proceeding and not on direct appeal, be reviewed under *Kotteakos* formulation to determine whether the error "had substantial and injurious effect or influence in determining the jury's verdict."[34]

Justice Stevens, concurring in *Brecht v Abrahamson*, said that *Kotteakos* requires de novo review "in the context of the entire trial record,"[35] and "requires a reviewing court to decide that 'the error did not influence the jury,' " and that "the judgment was not substantially swayed by the error . . . ."[36]

---

the face of overwhelming evidence of guilt shown here" that any error "failed to have any 'substantive influence' on the verdict," citing *Kotteakos, supra*, p 765. Justices Brennan's and Stevens' separate opinions are instructive.

[34] See 507 US 631.

The Court said that the "*Kotteakos* [harmless-error] standard is thus better tailored to the nature and purpose of collateral review, and more likely to promote the considerations underlying our recent habeas cases." [*Id.*, pp 637-638.]

[35] *Id.*, p 641.

The majority and the dissenters in *O'Neal v McAninch, supra*, were in agreement that the reviewing court should study the entire record. The majority said that a record review ordinarily will enable the reviewing court to make up its mind about the harmlessness of the error. And, indeed, the reviewing court has an obligation to review the record in order to make such a judgment.

[36] Justice Stevens continued his exposition of *Kotteakos*, stating:

In a passage that should be kept in mind by all courts that review trial transcripts, Justice Rutledge wrote that the question is *not*

"were they [the jurors] right in their judgment, regardless of the error or its effect upon the verdict. It is rather what effect the error

As previously noted, last year, in *O'Neal v McAninch, supra*, the United States Supreme Court elaborated on the *Kotteakos* formulation,[37] and addressed the "special circumstance in which record review leaves the conscientious judge in grave doubt about the likely effect of an error on the jury's verdict." The Court elaborated on what constitutes "grave doubt," stating:

> (By "grave doubt" we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.) We conclude that the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (i.e., as if it had a "substantial and injurious effect or influence in determining the jury's verdict").[38]

The Court expressly declined to phrase the issue in terms of burden of proof.

---

had or reasonably may be taken to have had upon the jury's decision. The crucial thing is the impact of the thing done wrong on the minds of other men, not on one's own, in the total setting.

"This must take account of what the error meant to them, not singled out and standing alone, but in relation to all else that happened. And one must judge others' reactions not by his own, but with allowance for how others might react and not be regarded generally as acting without reason. This is the important difference, but one easy to ignore when the sense of guilt comes strongly from the record." [*Id.*, pp 642-643 (citations omitted).]

[37] *O'Neal v McAninch* was a federal habeas corpus proceeding. Although a federal habeas corpus court first must find federal constitutional or federal statutory error, the harmless-error analysis proceeds, by reason of the Court's decision in *Brecht v Abrahamson*, under the approach set forth in *Kotteakos* and not the *Chapman* beyond-a-reasonable-doubt standard.

[38] *O'Neal*, 513 US 435.

[W]e deliberately phrase the issue in this case in terms of a judge's grave doubt, instead of in terms of "burden of proof."[39]

The dissenting justices in *O'Neal* had no "quarrel with the majority's conclusion that once an error has been shown on *direct appeal*, the government must demonstrate that it was harmless if the conviction is to stand."[40] (Emphasis added.) The dissenters would have required a federal habeas corpus petitioner to bear the burden of persuasion that the challenged actions caused harm—that the "error was harmful"—and that the error was prejudicial.

Mateo is seeking relief on direct appeal, and the question is whether the error was harmless, not whether it was harmful. The reviewing court should

---

[39] *Id.*, 513 US 436.

The Court continued:

The case before us does not involve a judge who shifts a "burden" to help control the presentation of evidence at a trial, but rather involves judges who apply a legal standard (harmlessness) to a record that the presentation of evidence is no longer likely to affect. In such a case, we think it conceptually clearer for the judge to ask directly, "Do I, the judge, think that the error substantially influenced the jury's decision?" than for the judge to try to put the same question in terms of proof burdens (e.g., "Do I believe the party has borne its burden of showing . . . ?") As Chief Justice Traynor said:

"Whether or not counsel are helpful, it is still the responsibility of the . . . court, once it concludes there was error, to determine whether the error affected the judgment. It must do so without benefit of such aids as presumptions or allocated burdens of proof that expedite fact-finding at the trial." R. Traynor, The Riddle of Harmless Error 26 (1970) . . . . [*Id.*]

[40] *Id.*, 513 US 448.

*O'Neal*, in contrast with the instant case, was not a direct appeal, but rather a federal habeas corpus proceeding, requiring that the petitioner establish a violation of the federal constitution or a federal statute.

ask whether the error is harmless, not whether it is harmful.

## VI

The majority puts off to another day deciding the level of assurance or confidence that a reviewing court must have that a preserved, nonconstitutional error was not prejudicial and, thus, harmless.[41] It states that "[t]he *Kotteakos* test, as articulated by the prosecutor, does not definitively settle on this question,". and that "federal courts have variously adopted tests described as a highly probable, more probable than not, and a reasonable likelihood that the error affected substantial rights."[42] The majority continues that Chief Justice Traynor, in his book on harmless error, discussed the "highly probable" and "more probable than not" tests, and "suggests that the highly probable test strikes the appropriate balance between protecting both the public and defendants' interests in fair trials."

## A

Most circuits that have considered the level of confidence or assurance issue employ the "highly probable" test:

*United States v Cudlitz,* 72 F3d 992, 999 (CA 1, 1996) ("we are instructed to ask whether it is 'highly probable' that the error did not 'contribute to the verdict' ").

*United States v Tussa,* 816 F2d 58, 67 (CA 2, 1987) ("in order to find harmless error, we must find it

---

[41] *Ante,* pp 207 and 218.
[42] *Id.,* pp 218-219.

' "highly probable" that the error did not contribute to the verdict' ").

*United States v Quintero*, 38 F3d 1317, 1331 (CA 3, 1994) ("we must evaluate whether it is 'highly probable that the evidence did not contribute to the jury's judgment of conviction.'" *Government of Virgin Islands v Toto*, 529 F2d 278, 284 [CA 3, 1976]).

*United States v Ince*, 21 F3d 576, 583 (CA 4, 1994) ("whether we believe it 'highly probable that the error did not affect the judgment' ").

*United States v Mackin*, 163 US App DC 427, 435; 502 F2d 429, 437 (1974) ("In reviewing the proceedings this court must decide whether it was 'highly probable that the error had substantial and injurious effect or influence' in determining the jury's verdict' ").

The United States Court of Appeals for the Tenth Circuit in *United States v Wacker*, 72 F3d 1453, 1473 (CA 10, 1995), declared that error is "harmless 'unless it has a "substantial influence" on the outcome or leaves one in "grave doubt" as to whether it had such effect.' "

The United States Courts of Appeals for the Fifth Circuit and Eleventh Circuit (a split-off of the Fifth) appear to reiterate the *Kotteakos* formulation and then announce a decision.

In *United States v Neuroth*, 809 F2d 339, 342 (CA 6, 1987), the United States Court of Appeals for the Sixth Circuit declared: "An error, not of constitutional dimension, is harmless unless it is more probable than not that the error materially affected the verdict." *Neuroth*, did not refer to *Kotteakos*. Subsequent cases do, and do not include the "more probable than not" formulation. See, e.g., *United States v Dean*, 969 F2d 187, 197 (CA 6, 1992), and *United States v*

*Wiedyk,* 71 F3d 602, 607 (CA 6, 1995) (using "fair assurance" language from *Kotteakos*).

The United States Court of Appeals for the Seventh Circuit does not appear to have moved beyond the language of *Kotteakos*, often relying on the "substantial influence" language. *United States v Grier,* 866 F2d 908, 920 (CA 7, 1989). There was a time, however, when the circuit employed a "significant possibility" standard, but that seems to have been abandoned in favor of reliance on *Kotteakos* itself. *United States v Marrero,* 486 F2d 622, 627 (CA 7, 1973).

The United States Court of Appeals for the Eighth Circuit in *United States v Nevils,* 897 F2d 300, 307 (CA 8, 1990) said: "We must be able to say with 'fair assurance' that the error did not sway the jury's verdict."

The United States Court of Appeals for the Ninth Circuit, in *United States v Hitt,* 981 F2d 422, 425, n 2 (CA 9, 1992), observed that at times the circuit had applied a "fair assurance" test and at others a "more probable than not" test, and said:

> A 55% likelihood that the error was harmless qualifies as "more probable than not," but it's hardly a "fair assurance" of harmlessness.

*Kotteakos* contains its own level of confidence and assurance tests, namely, the question is whether the error had "substantial influence" on the trier of fact, and if the reviewing court "is left in grave doubt, the conviction cannot stand":

> If, when all is said and done, the conviction is sure that the error did not influence the jury, or had but very slight effect, the verdict and the judgment should stand, except perhaps where the departure is from a constitutional norm

or a specific command of Congress. But if one cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected. The inquiry cannot be merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand. [*Id.*, pp 764-765 (citation omitted).]

It appears that the alternative expressions of the level of confidence or assurance an appellate court on direct review must have before declaring that a preserved nonconstitutional error was not prejudicial and, thus, harmless, are the "substantial influence"/"grave doubt" standard set forth in *Kotteakos* itself, and the alternatives suggested by Justice Traynor of "highly probable," adopted in most United States Courts of Appeals, or "more probable than not," not regularly employed in any circuit, the vague "fair assurance" test and the "reasonable likelihood" test, adverted to in footnote 19 of the majority opinion, set forth in *United States v Hawkins*, 905 F2d 1489, 1493 (CA 11, 1990).

This Court is adequately informed concerning the alternatives, and the briefing in this case is more than adequate.

B

Further, the bench and bar have been awaiting a definitive statement from this Court since *People v Anderson (After Remand)*, 446 Mich 392, 407, n 39; 521 NW2d 538 (1994), was decided with the following observation:

> Accordingly, we save for another day, after full briefing
> and argument, the distinction between, and the enunciation
> of, the constitutional harmless error test and Michigan's
> nonconstitutional harmless error test.

On the same day that *Anderson* was decided, this
Court decided *People v Dunn*, 446 Mich 409; 521
NW2d 255 (1994), where this Court concluded that
the admission of tainted evidence was not harmless,
but did so without reference to this Court's harmless
error jurisprudence in deference to the decision
reflected in *Anderson* to save until another day, after
full briefing and argument, the elucidation of the stan-
dard for reviewing preserved nonconstitutional error.
Also on the same day that *Anderson* and *Dunn* were
decided, this Court decided *People v Stanaway*, 446
Mich 643; 521 NW2d 557 (1994), where, in a separate
opinion, a colleague observed:

> Despite guidance from both our court rules and statute,
> this Court has yet to fully examine the relevant considera-
> tions for nonconstitutional harmless error and certainly has
> failed to set forth a clear and concise nonconstitutional
> harmless-error test. Instead, this Court has generally chosen
> to rely on the harmless-error statute and court rules for the
> limited guidance provided therein in making this determina-
> tion. *People v Travis*, 443 Mich 668, 686; 505 NW2d 563
> (1993). From a plain reading of these rules, however, the
> vague concept of injustice certainly does not provide any
> meaningful help to appellate courts in reviewing nonconsti-
> tutional error. [*Id.*, pp 697-698 (RILEY, J., concurring).]

Lastly, Mateo's application for leave to appeal was
held in abeyance pending this Court's decision in *Peo-
ple v Dunn*, which, for reasons already stated, did not
decide the appropriate standard for determining when
preserved nonconstitutional error requires reversal. In

granting leave to appeal in this case, we asked the parties to brief "what is the appropriate standard for determining when nonconstitutional error in admitting evidence is reversible." See n 11.

C

I would, therefore, complete the task, and decide the level of assurance or confidence question under the circumstances that the alternative possible tests have been considered and discussed in countless cases, the Court is fully informed, both from our own experiences in reviewing literally hundreds, if not thousands, of cases where the harmless error issue permeates the disposition at the Court of Appeals level and at this level, and the more than adequate briefing and independent research as reflected in the majority discussion of Justice Traynor's work on harmless error.

VII

As stated in the concurring opinion in *Stanaway*, "the vague concept of injustice certainly does not provide any meaningful help to appellate courts in reviewing nonconstitutional error."[43] Nothing is gained, and much lost, by preserving the reformulated "miscarriage of justice" formula.

There can be little doubt that it is ultimately this Court's responsibility, and not that of the Legislature, to determine whether it is consistent with the concept of appellate *judicial* review, and the proper exercise of the *judicial* power, and the concept of a fair trial embodied in the Due Process Clause, to

---

[43] *Stanaway, supra*, p 698 (RILEY, J., concurring).

ignore events at a trial that taint a conviction or encourage practices that debilitate or undermine the high standards one expects to be observed and enforced in a court of justice.[44]

Continued verbalization of miscarriage of justice as a test is inconsistent with this Court's reaffirmation today that a reviewing court may not affirm a conviction "simply because it concludes the jury reached the right result."[45]

The impropriety of continuing the miscarriage of justice formula then becomes clearer upon consideration of this Court's recent decision in *People v Grant*, 445 Mich 535; 520 NW2d 123 (1994), where, following the lead of the United States Supreme Court in *United States v Olano*, 507 US 725; 113 S Ct 1770; 123 L Ed 2d 508 (1993), this Court recognized that even where the defendant fails to preserve nonconstitutional error, an appellate court may reverse for "plain forfeited error" even though, as stated in *Olano*, there has not been a miscarriage of justice in the sense that the defendant is actually guilty, if the error "seriously affects" the fairness, integrity or public reputation of judicial proceedings.

VIII

Applying[46] the *Kotteakos* standard, applicable to nonconstitutional error, as elaborated in *Brecht* and

---

[44] See ns 1-3, 14, and discussing *Nichols, Soltar,* and *Bigge,* n 32 *supra,* and accompanying text.

[45] *Ante,* p 206.

[46] The United States Supreme Court in *O'Neal* did not itself undertake a review of the record to determine whether the error was harmless. It remanded for further proceedings to the United States Court of Appeals

*O'Neal,* I turn to a consideration, on de novo review of the whole record, whether the error in admitting Brecht's testimony was harmless.

I agree with Mateo, contrary to a statement of the Court of Appeals, that the evidence against him was not "overwhelming." While there was possibly overwhelming evidence that Cantu had been assaulted by someone,[47] no one other than Cantu testified that Mateo was the assailant. Cantu clearly was an interested witness, and therefore his credibility could be questioned. Mateo did not testify, but, as a matter of law, that cannot be weighed in evaluating the harmlessness of the error in admitting Jennifer Brecht's testimony that Blair had warned Brecht that Mateo was "very violent," thereby impeaching Blair—who had testified that Mateo was with her when the assault was claimed to have taken place—and who had denied having conversations with Brecht about Mateo.

If that were the whole record, I would be at least in grave doubt whether the error had substantial and

for the Sixth Circuit after having stated its conclusion that the Sixth Circuit had erred in stating that the habeas petitioner must bear the burden of establishing whether the error was prejudicial.

In the instant case, in contrast with *O'Neal* at the federal Court of Appeals level, the Michigan Court of Appeals applied at least as high a standard in reviewing for harmlessness as we conclude is applicable. We note, however, Justice Brennan's observation in *United States v Lane,* n 33 *supra,* p 465, that the United States Supreme Court, and, I would add immodestly, this Court, is ordinarily manifestly ill-equipped to undertake harmless-error analysis without the benefit of prior harmless-error analysis by the Court of Appeals.

[47] Cantu testified that he was assaulted with a gun and a knife. As the Court of Appeals observed, Cantu was treated at a hospital for multiple lacerations, and a hand gun was recovered from the bathroom where he claimed the assault took place. Police officers testified that the bathroom door had been broken, thereby confirming that aspect of Cantu's testimony.

injurious effect or influence in determining the jury's verdict. There would only be Cantu's testimony identifying Mateo as the assailant, and Blair's alibi testimony that Mateo was with her at the time of the assault. Brecht's testimony impeaching Blair's testimony and indicating that Mateo was at times a violent womanizer, might very well then have swayed the jury.

Additionally, however, there was the testimony of two police officers that Cantu's sister, Elva Lulgjurflj, had confirmed, at the scene of, and shortly after, the alleged assault, that Mateo was the assailant.

The officers' testimony was hearsay, but Mateo's lawyer failed to object. Cantu's mother's testimony that he identified Mateo as his assailant shortly after the incident, might have been admissible, although hearsay, as an excited utterance or some other basis. But, Mateo's lawyer's failure to object leaves the record silent in that regard. Courts disagree concerning the weight to accord hearsay admitted without objection. The majority view is that hearsay admitted without objection has probative value.[48]

On the same premise that the harmless-error analysis for preserved error differs from that where the error has not been preserved,[49] an appellate court undertaking review for harmlessness should consider, as part of the whole record, unobjected to hearsay—

---

[48] 29A Am Jur 2d, Evidence, § 1441, pp 822-823. See *People v Maciejewski*, 68 Mich App 1, 3; 241 NW2d 736 (1976).

[49] See *People v Grant, supra*.

We decline the invitation of the amicus curiae Prosecuting Attorneys Association of Michigan, to expand on what was said in *Grant* respecting review for plain error when the issue has not been preserved for appellate review.

in this case, the hearsay statements identifying Mateo as the assailant.

To be sure, the inquiry in assessing the harmlessness of error is whether the error may have swayed the jury, not the quantity or quality of the other evidence. Nevertheless, in deciding whether the error may have swayed the jury, the reviewing court must consider the whole record, not for the purpose of itself making a judgment concerning the defendant's guilt or innocence, but rather for the purpose of determining whether the jury might have been swayed by the erroneously admitted testimony.[50]

Cantu's testimony identifying Mateo as the assailant, together with the hearsay corroboration, was opposed by Blair's testimony that Mateo was with her at the time of the assault. It is questionable whether any juror's assessment of the credibility of the opposing testimony was swayed by Brecht's assertion that Blair had, contrary to her denial, conversed with Brecht concerning Mateo disparagingly.[51]

There is a further consideration, however. The concept of harmless error has become part of the equation for the purpose of determining whether there is error at all, as in the assessment of whether a defendant was deprived of the effective assistance of counsel. In *People v Pickens*, 446 Mich 298; 521 NW2d 797 (1994), this Court, again following the lead of the United States Supreme Court, adopted the approach set forth in *Strickland v Washington*, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984), which imposes on

---

[50] *United States v Lane*, n 33 *supra*, pp 464-465 (Brennan, J.).

[51] None of these witnesses, Cantu, who testified that Mateo assaulted him, Cantu's mother, and Brecht and Blair, former girlfriends of Mateo, were disinterested witnesses.

the defendant the burden of showing that, absent counsel's errors, the factfinder would have had a reasonable doubt respecting guilt. This Court said that "under Michigan law, counsel's ineffective assistance must be found to have been prejudicial in order to reverse an otherwise valid conviction."[52]

The Court's analysis in *Grant* and *Pickens* considered whether the unpreserved error in *Grant* and the error of counsel in *Pickens*, might have been outcome-determinative.[53]

Clearly, the error would be outcome-determinative if the reviewing court would be in "grave doubt" or be unable to declare that it is "highly probable" that the error did not affect the verdict, but for error of counsel that permitted inadmissible evidence to become part of the record that may have influenced or swayed the jury.

No possible trial strategy could have justified Mateo's lawyer's failure to have objected to the inadmissible hearsay. His failure to do so fell below an objective standard of reasonableness in the representation of persons accused of crime.

For the foregoing reasons, I conclude that the error was not harmless, and would remand for a new trial.

The majority asserts that the evidence of Mateo's guilt is "overwhelming." The mantra "overwhelming" ignores the imperative of considering not only evidence tending to establish guilt, but also the evidence tending to refute the evidence of guilt. The Court of Appeals and this Court, on review of the whole record, were and are required to assess not only

---

[52] *Pickens, supra,* p 314.
[53] *Grant, supra,* p 553; *Pickens, supra,* p 312.

Cantu's testimony, but also Crystal Blair's alibi testimony tending to show that Mateo could not have been the assailant.

I would reverse and remand for a new trial.