# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

MICHAEL PATRICK-MURPHY HAMILTON,

        Defendant-Appellant.

UNPUBLISHED
August 1, 2017

No.  319980
Jackson Circuit Court
LC No.  12-004848-FC

ON REMAND

Before:  SAWYER, P.J., and M. J. KELLY and SHAPIRO, JJ.

PER CURIAM.

This case returns to us on remand from our Supreme Court. *People v Hamilton*, 500 Mich 938 (2017).  Defendant, Michael Hamilton, was convicted by a jury of first-degree premeditated murder, MCL 750.316, assault with intent to commit murder, MCL 750.83, two counts of possession of a firearm during the commission of a felony, MCL 750.227b, and two counts of unlawfully driving away an automobile, MCL 750.413.  We again affirm.

At trial, Hamilton did not dispute that he had shot and killed Robert Marcyan.  Instead, he submitted evidence suggesting that he was legally insane at the time of the shooting because he was involuntarily intoxicated by the prescription drug, Adderall, which he was taking as prescribed by his psychiatrist, Dr. Raad Jajo.  Both the prosecution and the defense presented lengthy testimony from multiple expert witnesses, including rebuttal testimony from Rosemary Heise, who "diagnosed" Hamilton as a "drug addict" based on her review of some of the records available in the case.  Hamilton challenged Heise's qualifications and the substance of her testimony.  In the earlier appeal, we concluded that even if the trial court had abused its discretion in admitting Heise as an expert witness, any error was harmless because her testimony was cumulative to the untainted evidence. *People v Hamilton*, unpublished opinion per curiam of the Michigan Court of Appeals, issued February 9, 2016 (Docket No. 319980); pp 6-7.

Hamilton appealed to our Supreme Court, which vacated Part III of our opinion, and remanded the case to us to reconsider:

> the defendant's claims regarding the qualification and testimony of Rosemary Heise.  The Court of Appeals majority correctly cited *People v Lukity*, 460 Mich 484, 495-496 (1999), for the proposition that a preserved, non-constitutional error

-1-

is not a ground for reversal unless it is more probable than not that the error was outcome determinative. It erred, however, in determining that because Heise's testimony was arguably cumulative, it was harmless. See *People v Smith*, 456 Mich 543, 555 (1998) ("[T]he fact that [a] statement was cumulative, standing alone, does not automatically result in a finding of harmless error."). On remand, the Court of Appeals shall engage in "an examination of the entire cause," *Lukity*, 460 Mich at 495-496, and reconsider whether it is more probable than not that any error was outcome determinative. [*Hamilton*, 500 Mich at 938.]

After further review, we conclude that the trial court abused its discretion in admitting Heise as an expert, but that, after examination of the entire cause, Hamilton cannot establish that it is more probable than not that the error was outcome determinative. Accordingly, we affirm.

## I. EXPERT WITNESS

### A. STANDARD OF REVIEW

Preserved challenges to a trial court's decision to qualify a witness as an expert are reviewed for an abuse of discretion. *People v Unger*, 278 Mich App 210, 216; 749 NW2d 272 (2008).[1] "An abuse of discretion occurs when the court chooses an outcome that falls outside the range of reasonable and principled outcomes." *Id*. at 217. However, even if a trial court abused its discretion in admitting evidence, including the erroneous admission of expert testimony, "a preserved, nonconstitutional error is not a ground for reversal unless after an examination of the entire cause, it shall affirmatively appear that it is more probable than not that the error was outcome determinative." *Lukity*, 460 Mich at 495-496, quoting MCL 769.26. The defendant bears the burden to establish such a miscarriage of justice. *Id*. at 495. "The inquiry into prejudice 'focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence.' " *Smith*, 456 Mich at 555, quoting *People v Mateo*, 453 Mich 203, 215; 551 NW2d 891 (1996).

### B. QUALIFICATIONS

Under MRE 702, an expert may testify if "(1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." The purpose of MRE 702 is to ensure that proffered expert witness testimony is reliable. *People v Kowalski*, 492 Mich 106, 131, 140; 821 NW2d 14 (2012) (opinion by MARY BETH KELLY, J.). Therefore, before admitting expert witness testimony, the trial court must ensure that the testimony is reliable. *People v Dobek*, 274 Mich App 58, 94; 732 NW2d 546 (2007). "While the exercise of the gatekeeper function is within a court's discretion, the court may neither abandon this obligation nor perform the function inadequately." *Id*. The trial court must exclude expert testimony "when it is based

---

[1] The prosecutor argues on appeal that Hamilton's challenge to Heise's qualifications and testimony is not preserved. Based on our review of the record, it is clear that Hamilton objected to both Heise's qualifications and her testimony, so the issue is preserved.

on assumptions that do not comport with the established facts or when it is derived from unreliable and untrustworthy scientific data." *Id.* In particular, the trial court must take care to exclude "junk science." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). In *Gilbert*, our Supreme Court explained that

> MRE 702 mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data. Thus, it is insufficient for the proponent of expert opinion merely to show that the opinion rests on data viewed as legitimate in the context of a particular area of expertise (such as medicine). The proponent must also show that any opinion based on those data expresses conclusions reached through reliable principles and methodology. [*Id.*]

The Court further cautioned that "[c]areful vetting of all aspects of expert testimony is especially important when an expert provides testimony about causation." *Id.*

In this case, the trial court failed to conduct the searching inquiry required by *Gilbert*. The trial court initially took testimony from Heise outside the presence of the jury. Based on that testimony, it is clear that Heise clearly had training and knowledge relating to substance abuse. She had a nursing degree and had obtained a Masters degree from Western Michigan University in "counseling psychology with a minor in addiction studies." Further, she had worked in various capacities at several addiction treatment centers and was currently employed by the Jackson Circuit Court as the clinical manager of the Recovery Court program, which was a treatment program for felons with serious addictions. In her role as the clinical manager of the Recovery Court program, Heise evaluated convicted felons whose sentencing guidelines placed them in a "straddle cell," and she determined if they would benefit from a drug-treatment program instead of a jail sentence.[2] Nevertheless, Heise testified that she was not a physician, a licensed psychologist, or a licensed limited psychologist. Additionally, when asked what she was going to give an opinion about, Heise stated that she was going to "discuss the history of Mr. Hamilton's substance abuse," but she did not actually state what her opinion was nor how she had arrived at it. She did indicate that she had been provided with parts of the case file, including the expert opinions from the forensic psychologists, the police reports, Dr. Jajo's records, and the Michigan Automated Prescription (MAP) report. And Heise noted that she generally would diagnosis people as addicts or substance abusers simply by examining documentation related to the individual's substance abuse history.

At the conclusion of Heise's testimony to the bench, Hamilton's lawyer stated that he still did not understand what Heise was expected to be an expert in. The court responded that it was not going to "preview what she is going to testify, the details at this point." That was error. The court had a duty to ensure that Hesie's testimony would be reliable, which it could not effectively do in this case without first determining what opinion testimony Heise was going to

---

[2] Heise testified that as part of her responsibilities as the clinical manager of the Recovery Court program she had "to arrive at a diagnosis," but she did not explain what type of diagnosis she would have to arrive at.

-3-

offer and whether it was based on reliable principles and methodology. See generally *Gilbert*, 470 at 782. Despite that duty, the court allowed Heise to testify before the jury without any notion of what opinions she would be offering and what principles and methodology the opinions would be based on.

The following day, Heise testified before the jury. During that voir dire, Heise explained that she had testified as an expert in child neglect cases on five or six occasions, but had never testified as an expert in a criminal case. She also testified that she was prepared to give a diagnosis of Hamilton based on "reading the transcripts." Thereafter, Hamilton's lawyer objected, stating:

> You Honor, I believe it's problematic. The only experience she has appears to be with women and children, abuse and neglect, or with Recovery Court where persons have an admitted and documented track record of narcotic abuse or are seeking dispensation and have something to gain by working with her. I believe that she is not licensed as a physician, she is not licensed as a psychologist, she's never been qualified as a—in a capital murder case before and I guess my quandary is twofold. One, just what is it she's going to give an opinion about, which is not clear, and based on—once we answer that question I can go further into my voir dire, but right now she's a—she's a Recovery Court coordinator who's going to give a psychosocial medical diagnosis about my client.

The trial court overruled the objection, stating that Heise had met the requirements of MRE 702 and would "be allowed as an expert in the area of substance abuse and addiction." Again, the court did this without any indication as to what opinion Heise was going to offer or what principles and methodology she had used to reach those conclusions.

Heise was thereafter allowed to present an extremely broad and ultimately speculative set of opinions. She diagnosed Hamilton as an "addict" because he had a documented episode of Vicodin abuse. Heise further opined that all addicts are either active or in recovery. She stated that Hamilton was an active addict because, even if he had stopped taking Vicodin months before the shooting, he could not be considered in recovery because he was taking Adderall. Notably, Heise cited no principles or standards to support her conclusions.

Heise admitted that she had no evidence that Hamilton was taking or had Vicodin in his system on the day of the shooting. However, she nevertheless speculated that Hamilton's use of fans to cool down the night before the shooting was indicative of a detox from Vicodin or possibly from "taking too much Adderall." Further, she opined that based on Hamilton's history of Vicodin abuse, he needed to be placed in a detox program followed by a long-term residential treatment program before he could be considered in recovery. Without seeing signs of such a treatment, she opined that his prognosis for recovering from his Vicodin addiction was "poor." Ultimately, Heise suggested that Hamilton was possibly still using Vicodin, noting that his history raised "red flags" for her and made her "wonder" about "his actual current use of Vicodin." Given that there was nothing in the materials Heise reviewed that showed Hamilton was actually using Vicodin in the months before the shooting, and given that the record reflects that Hamilton did not suffer any apparent opiate withdrawal after he was arrested, this speculative testimony violated the requirement in MRE 703 that the "facts or data in the

-4-

particular case upon which an expert bases an opinion or inference shall be in evidence." Additionally, Heise speculated that Hamilton may have been snorting Adderall despite the absence of any evidence in the record to support such an assertion, which was also improper under MRE 703.

Heise also questioned the reliance the other experts placed on Hamilton's MAP history. She opined that the MAP reports are "not always" fully accurate, but offered no specific examples of erroneous MAP reports or any studies to support her opinion. She further testified that Hamilton was not honest with Dr. Jajo because he had not told Dr. Jajo he was taking Suboxone. The record, however, reflectsa that Dr. Jajo was aware of Hamilton's Suboxone prescription. Regardless, based on her erroneous view of Hamilton's honesty, Heise concluded that Hamilton's behavior was that of an addict because "a component of addiction is denial and dishonesty." She further attacked Hamilton's character for honesty by testifying that the most important thing for an addict was to get the drug at all costs, including stealing money or committing violent crimes in order to do so.

Given the speculative nature of Heise's testimony, the lack of evidentiary support for some of her "wonderings" and "maybes," and the lack of any discernable and reliable principles and methodologies for reaching her opinions, we conclude that the trial court abused its discretion and abandoned its role as gatekeeper when it allowed Heise to testify without first ensuring that her testimony would be reliable and based on actual facts as opposed to mere speculation and wonderings.

## C. HARMLESS ERROR

Having determined that the trial court abused its discretion, we turn to whether Hamilton has met his burden of showing that, " 'after an examination of the entire cause, it shall affirmatively appear' that it is more probable than not that the error was outcome determinative." *Lukity*, 460 Mich at 495-496, quoting MCL 769.26. In doing so, the reviewing court "focuses on the nature of the error and assesses its effect in light of the weight and strength of the untainted evidence." *Smith*, 456 Mich at 555 (citation and quotation marks omitted). "An error is deemed to have been 'outcome determinative' if it undermined the reliability of the verdict." *People v Elston*, 462 Mich 751, 766; 614 NW2d 595 (2000) (opinion by KELLY, J.). While MCL 769.26 does not require actual innocence, *Mateo*, 453 Mich at 211, when the error is slight in comparison to the strength of the prosecution's remaining evidence, reversal is not merited, see *id*. at 215 (stating that reversal is only required if the error was prejudicial).

In evaluating prejudice, the first step is to assess the improper evidence's potential prejudice to the defendant. *People v Toma*, 462 Mich 281, 297; 613 NW2d 694 (2000). The prosecution introduced Heise's testimony to develop its theory that Hamilton's motive for the shooting was that of a "run-of-the-mill" drug addict willing to do anything—even murder—to get more drugs. However, as we explained in our earlier opinion, there was untainted evidence in the record raising "red flags" with regard to Hamilton's drug use. We explained:

> Dr. Glen Toplyn, an expert in forensic psychiatry from the Center for Forensic Psychiatry, testified that, although he found no evidence to conclude that defendant was abusing Adderall, there was information to question whether

defendant was, in fact, abusing. Dr. Patrick Gibbons, an expert in addiction psychiatry, testified that there were a lot of "red flags" regarding defendant's use of Adderall. Those "red flags" included that in December 2011 defendant described symptoms, i.e., narcolepsy, to his treating psychiatrist, Dr. Jajo, for which Adderall is prescribed, that in April 2012 defendant said that he had lost his prescription, and that in July 2012 defendant said on two occasions that his prescription was either lost or stolen. Additionally, on August 29, 2012, defendant filled a prescription for Adderall; 60 pills had been dispensed to defendant. The pill bottle was found empty 10 days later on September 8, 2012. Dr. Jeffrey Wendt, who testified as a psychiatric expert, admitted that the empty bill bottle could raise a concern that defendant was abusing Adderall. In rebuttal closing argument, the prosecution made a lengthy argument, based on Jajo's records, that defendant was not in compliance with the prescribed Adderall use. The prosecution referenced the above facts, and also the facts that on April 26, 2012, July 26, 2012, and August 2, 2012, defendant visited Jajo even though his current prescription had not run out and that on two of these visits, the April 26 and August 2 visits, defendant obtained a new prescription for Adderall. . . .

In sum, Heise's testimony was largely cumulative to that given by the various expert witnesses from both sides in this case. Moreover, any argument made by the prosecution in closing could still have been made without Heise's testimony, based upon the testimony of the those [sic] other experts. [*Hamilton*, unpub op at pp 6-7.]

We continue to believe that Heise's testimony was in fact cumulative to the untainted evidence offered, and reaffirm our earlier analysis that the cumulative nature weighs against a finding of reversible error. Further, we conclude that based on this evidence, the jury could infer—independent of the tainted evidence—that Hamilton was abusing drugs. Additionally, we note that there was also testimony that Hamilton needed money, had possibly broken into and was robbing his parents' cottage, and that he stole cash from Marcyan's BMW after he fled the scene of the shooting. For those reasons, there was very little additional prejudice to Hamilton from Heise's improper opinion testimony.

Moreover, to the extent that it was more damaging to have an expert witness—one acting with the imprimatur of the court—to diagnosis Hamilton as an addict, the prejudice was lessened by (1) an effective cross-examination pointing out the speculative and improper methodology used by Heise, (2) the jury's own question regarding Heise's qualifications,[3] (3) a detailed sur-rebuttal from Gibbons and Wendt that further challenged Heise's conclusions and methodology, (4) the lack of emphasis on Heise or her testimony in the prosecution's closing and rebuttal arguments, and (5) the trial court's instruction to the jury with regard to how it could use expert

---

[3] One of the jury questions was whether Heise was called to give or qualified to give a medical opinion. Heise responded that she was called to testify about how addiction may apply, not to give a medical opinion, and she added that she was not qualified to give a medical opinion.

opinion testimony. In other words, the majority of prejudice caused by Heise's testimony was present in the untainted evidence and the limited additional prejudice caused by her testimony was lessened through the efforts of Hamilton's lawyer, the prosecutor's lack of reference to the testimony, and the court's instructions to the jury.

In contrast, it was undisputed that Hamilton shot and killed Marcyan, and the prosecution presented overwhelming and uncontroverted evidence in support of that fact. Similarly, there was untainted evidence suggesting that Hamilton was not legally insane when he did so.[4] In particular, Toplyn, the prosecution's expert, testified that Hamilton's story that he believed he was in a movie at the time of the shooting to be unbelievable because the story was too neatly crafted to fit the insanity defense. Toplyn found that lack of corroboration of the movie story after the shooting weighed against a finding of legal insanity. He noted that (1) Hamilton did not say or do anything at the scene of the shooting to indicate that he was in a movie, (2) Hamilton did not say anything about being a movie to the jail psychiatrist, and (3) Hamilton did not say anything about being in a movie after his suicide attempt. In addition, Toplyn testified that Hamilton's statements about the gun showed that he knew it was real and that fleeing and throwing the gun into the pond to dispose of it showed that he appreciated the wrongfulness of his actions. Toplyn ultimately concluded that Hamilton was legally sane at the time of the shooting. Although Hamilton presented expert opinion testimony from Wendt in support of his theory that he was legally insane at the time of the shooting,[5] the battle between the experts, i.e., Toplyn and Wendt, was for the jury to resolve. That question was not significantly impacted by Heise's testimony, which touched on addiction, not mental illness and the inability to appreciate the nature and quality or the wrongfulness of one's conduct or to conform said conduct to the requirements of the law. As such, we conclude that there was strong, untainted evidence from which the jury could conclude that Hamilton was not legally insane at the time of the shooting. And, when taken as a whole, the properly admitted evidence

---

[4] In order to establish an insanity defense, the defendant must show that, as the result of a mental illness or mental retardation, he or she lacked the "substantial capacity either to appreciate the nature and quality or the wrongfulness of his or her conduct or to conform his or her conduct to the requirements of the law." MCL 768.21a(1); *People v Lacalamita*, 286 Mich App 467, 470; 780 NW2d 311 (2009). However, a mental illness, alone, does not constitute the defense of legal insanity. MCL 768.21a(1). Moreover, a defendant "who was under the influence of voluntarily consumed or injected alcohol or controlled substances at the time of his . . . alleged offense is not considered to have been legally insane solely because of being under the influence of the alcohol or controlled substances." MCL 768.21a(2).

[5] Wendt testified that Hamilton was behaving in a way consistent with a manic episode with psychotic features, which meant that he was not in touch with reality. Wendt stated that the manic episode with psychotic features was triggered by Hamilton's use of Adderall. Wendt ultimately opined that Hamilton was mentally ill at the time of the shooting because he had a substantial disorder of thought or mood and could no longer carry out normal life activities. He further opined that Hamilton did not appreciate the nature and quality of what he was doing or the wrongfulness of his conduct because he believed that he was following a script for a movie.

is sufficient to sustain Hamilton's conviction to the extent that we cannot say that it is more probable than not that a different outcome would have resulted.

Affirmed.

/s/ David H. Sawyer
/s/ Michael J. Kelly